Paula HAAVISTOLA

v.

**COMMUNITY FIRE COMPANY OF RIS-ING SUN, INC. and Richard G. Ayers, Kimberly Baeder, Raymond Blakely, Betty Cameron, Wesley F. Cameron, Samuel H. Coale, Herrel Curry, William Ewing, Charles R. Goodie, Howard Goodie, William Haines, Wayne L. Ingerson, Jeffrey Kennerd, Harold Montgomery, Jr., Gary R. Moore, Kenneth E. Morris, Jimmy G. Puffenbarger, Carl Rickenboch, Carol Tichnell, Donald K. Wehry, Tamra Wiggins.**

No. S 90–1637.

United States District Court,
D. Maryland.

Feb. 10, 1993.

George A. Nilson and Awilda R. Marquez, Piper & Marbury, and Deborah A. Jeon and Susan Goering, American Civil Liberties Union, Baltimore, MD, for plaintiff, Paula Haavistola.

Roger N. Powell, Pikesville, MD, for defendants, Community Fire Co. of Rising Sun, Inc., Richard G. Ayers, Kimberly Baeder, Raymond Blakely, Betty Cameron, Wesley F. Cameron, Samuel H. Coale, Herrel Curry, William Ewing, Charles R. Goodie, Howard Goodie, William Haines, Wayne L. Ingerson, Jeffrey Kennerd, Harold Montgomery, Jr., Gary R. Moore, Jimmy G. Puffenbarger, Carl Richenboch, Carol Tichnell, Donald K. Wehry, and Tamra Wiggins.

Roger N. Powell, Pikesville, MD, and Larry M. Wolf and Anthony V. Teelucksingh, Whiteford, Taylor and Preston, Baltimore, MD, for defendant, Kenneth E. Morris.

## MEMORANDUM OPINION

SMALKIN, District Judge.

This matter is before the Court on defendants' Motion for Summary Judgment, pursuant to Fed.R.Civ.P. 56, which has been opposed by the plaintiff. No oral hearing is needed. Local Rule 105.6 (D.Md.)

### I. *Factual Background*

This suit stems from an occurrence on March 24, 1990, in which the plaintiff, Paula Haavistola, ("Haavistola") alleges that she was sexually assaulted by Kenneth Truitt ("Truitt"). At the time of the alleged assault, both Ms. Haavistola and Mr. Truitt were volunteers at the Community Fire Company of Rising Sun, Inc. ("the Fire Company"). The Fire Company is a Maryland corporation providing firefighting, emergency medical/paramedic, and

rescue services to the Rising Sun, Maryland community and elsewhere. (First Amended Complaint at ¶ 5.) Haavistola's service as a volunteer ambulance aide with the Fire Company began in March, 1989. (Id.)

Plaintiff Haavistola alleges that the assault occurred in the ambulance bay at the Fire Company's station, immediately after Haavistola and Truitt had returned from responding to an emergency call. (Id. at ¶ 8.) Shortly thereafter, Haavistola reported the alleged assault to Assistant Fire Chief Carl Rickenboch, who advised her to present her complaint to the Fire Company's Board of Directors at their next monthly meeting, scheduled for March 26, 1990. (Id. at ¶ 9.)

Haavistola did appear before the Board of Directors on March 26, 1990, and reported both the March 24th incident and prior allegedly unwanted touching by Mr. Truitt to the Directors present. (Id. at ¶ 10.) In addition, she indicated her intention to file criminal charges against Truitt. After hearing her account, the Board asked Haavistola to confront Truitt at the meeting with the details of her allegation. (Id. at ¶ 11.) Haavistola agreed to this request. She also agreed to leave the Board's meeting room while the Directors met with Truitt alone. After a short period (approximately five (5) minutes), Haavistola was called back in and confronted Truitt with her allegations, which he summarily denied. The Board, following brief deliberations outside the presence of either of the parties, then suspended both Haavistola and Truitt indefinitely from membership in the Company, with such suspension to take effect immediately. (Id. at ¶ 12.) At that time, the Board conducted no further investigation.

In at least two subsequent meetings which Haavistola was not permitted to attend, the Board voted not to lift her sus-

pension. (Id. at ¶¶ 13 and 14.) Due to extensive media coverage of this incident, the Board of Directors issued a statement to the press on May 2, 1990, in which it explained the suspensions. (Id. at ¶ 15.) Public interest in this case and the news coverage of these events has continued to the present.

Subsequent to her suspension, Haavistola filed a criminal complaint against Truitt, and he was subsequently cleared of the charges against him in state court in March, 1991. In addition, on April 25, 1990, Haavistola filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was deferred to the Maryland Commission on Human Relations.[1] (Id. at ¶ 16a.) The parties entered into a Settlement Agreement in the state matter. Because the defendants have alleged that the plaintiff's attorney breached the Settlement Agreement, defendants now consider the Agreement void. (See Defs.' Reply, Ex. 1a & 1b.) Thus, the state action remains pending.

## II. *Procedural History in Federal Court*

In June of 1990, Haavistola filed this action naming the Fire Company, the individual Board of Directors members, and Kenneth Truitt as defendants.[2] The original eleven count Complaint included claims against the defendants pursuant to 42 U.S.C. § 1983 (West 1981 & Supp.1990), 28 U.S.C. §§ 2201–2 (West 1982 & Supp.1990), Article 46 of the Declaration of Rights of Maryland, and Maryland common law. The Fire Company and the individual Board members moved to dismiss the Complaint, pursuant to Fed.R.Civ.P. 12(b)(6), and for lack of subject matter jurisdiction over the plaintiff's claims. In a Memorandum and Order dated March 19, 1991, the Court dismissed Count 5 (abusive discharge) and Count 6 (intentional infliction of emotional distress) of the Complaint, as well as the

1. On January 15, 1991, over 180 days after her indefinite suspension from service with the Fire Company, Haavistola received a Notice of Right to Sue. (See Pl.'s First Amended Complaint at Ex. 4.) Subsequent to receiving her right-to-sue letter, Haavistola amended her Complaint to include Title VII claims. *See* discussion *infra.*

2. On December 9, 1992, this Court approved a voluntary stipulation of dismissal with prejudice as to Kenneth Truitt only.

plaintiff's claim for punitive damages against the Fire Company. (Paper # 30).

Soon thereafter, plaintiff amended her Complaint to add two additional counts of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (West 1981 & Supp.1991). In response, the Fire Company filed a motion to dismiss the additional counts for failure to state a claim of unlawful employment practices under the statute. (Paper # 35). Specifically, the Fire Company asserted that it was not an "employer," nor were its members "employees" within the meaning of 42 U.S.C. § 2000e. Analyzing defendant's claims under the standard articulated in *Rogers v. Jefferson–Pilot Life Insurance Co.*, 883 F.2d 324 (4th Cir.1989), the Court denied the defendant's preliminary motion to dismiss these counts. (Paper # 40).

Defendants then answered the Amended Complaint. Plaintiff next moved to join certain Fire Company Board member defendants who, through inadvertence, were not named in the original or subsequent Complaints. (Paper # 42.) Additionally, Haavistola moved once again for leave to amend the Complaint to include requests for a jury trial and punitive damages under the Civil Right Act of 1991 [3] and a count of abusive discharge, based upon the Court of Appeals of Maryland's decision in *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (Md.1991). By Letter Order dated May 18, 1992, the Court granted plaintiff's motion for joinder of defendants but denied, without prejudice, the plaintiff's request for leave to file a Second Amended Complaint.[4]

The case was reassigned to this Judge on July 28, 1992, upon the retirement of Judge Norman Ramsey. Pursuant to a Letter Order dated August 31, 1992, defendants submitted the present motion for summary

judgment in which, as requested by the Court, they rebriefed the Title VII "employer/employee" issue and focused upon whether the Fire Company could be considered a state actor for § 1983 purposes. Plaintiff duly opposed the motion.

### III. Standard for Summary Judgment Motion

A district court may grant summary judgment if there is "no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). The initial responsibility of informing the Court of the basis for the belief that summary judgment is warranted falls upon the moving party. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). Once a motion for summary judgment is made and supported, however, the nonmoving party "may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

For purposes of a summary judgment motion, a fact is material only if, when applied to the substantive law, that fact affects the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is genuine only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *Id.* While the Court may not weigh the evidence, it must determine whether there is a genuine issue for trial. As the Supreme Court stated in *Liberty Lobby*, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512.

**3.** The relief available to a Title VII plaintiff has been substantially expanded by the passage of the Civil Rights Act of 1991 to include compensatory damages as well as the right to a jury trial.

**4.** The Court's rationale for denying plaintiff's request was two-fold. First, given the uncertainty surrounding the retroactive application of

the Civil Rights Act of 1991, the Court indicated that further Title VII proceedings might best be addressed after the Fourth Circuit had definitively ruled on the subject. Second, the Court noted that settlement negotiations between the parties appeared to be progressing and the amendments did not "address the critical developments in the case." (Id.)

Summary judgment should not be granted, if, although the facts are not in dispute, there exists dispute concerning the conclusions or inference to be drawn therefrom. *Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co.*, 381 F.2d 245 (4th Cir.1967).

## IV. *Analysis*

### A. Title VII

■ In Counts XII and XIII of the First Amended Complaint, Ms. Haavistola alleges injury pursuant to The Civil Rights Act of 1964 (and 1991), codified at 42 U.S.C. § 2000e *et seq.* (commonly known as "Title VII" or "the Act"). Title VII provides that:

> it shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(a).[5] The discrimination Title VII was enacted to address "relates to the field of employment" and was intended to remedy the particular unfairness of prejudice in this area. 1 A. Larson & L. Larson, *Employment Discrimination* § 5.21, at 2–9 (1991); *Smith v. Berks Community Television*, 657 F.Supp. 794 (E.D.Pa.1987). Thus, courts have consistently held that "Title VII contemplates [that] some employment relationship" exist for Title VII's remedies to apply. *Vakharia v. Swedish Covenant Hosp.*, 765 F.Supp. 461, 463 (N.D.Ill.1991), *quoting Broussard v. L.H. Bossier, Inc.*, 789 F.2d 1158, 1159 (5th Cir.1986) (and cases cited therein).

A central issue in the present summary judgment motion is whether Ms. Haavistola can be considered an "employee" and the Fire Company an "employer" for Title VII liability purposes. The Fire Company argues that it is neither an "employer" nor are its volunteer members "employees" within the meaning of Title VII. In contrast, the plaintiff contends that she is an "employee" and the Fire Company an "employer" as those terms are defined under Title VII. (Pl.'s Opp'n at 4 ("employer" and employee" under Title VII are to be given a liberal construction to achieve the purposes of the statute)). Thus, Haavistola maintains that she is entitled to the remedies available in this statute.

Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." 42 U.S.C. § 2000e(b). In what has been described as "magnificent circularity," *Broussard*, 789 F.2d at 1160, the term "employee" is defined simply as "an individual employed by an employer...." 42 U.S.C. § 2000e(f). Title VII is applicable, therefore, *only* if a defendant has the required number (fifteen or more) of qualified "employees" to be considered a "covered" employer under Title VII. *Graves v. Women's Professional Rodeo Ass'n, Inc.*, 708 F.Supp. 233, 235 (W.D.Ark.1989), *aff'd*, 907 F.2d 71 (8th Cir. 1990). Employee status under Title VII is a question of federal law, "to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." *Calderon v. Martin County*, 639 F.2d 271, 272–23 (5th Cir.1981). Courts have indeed recognized the difficulty in applying these circular definitions of employer and employee in non-traditional employment contexts and have, therefore, devised their own analyses to determine if a relationship imposing Title VII liability exists between

---

**5.** In Count XIII, Haavistola alleges discrimination pursuant to § 2000e–3 which provides, in pertinent part, as follows:

> (a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

two parties. *See Graves v. Women's Professional Rodeo Ass'n, Inc.*, 907 F.2d 71 (8th Cir.1990).

A plain reading of subsections 2000e–2(a) and 2000e–3(a) indicates that an individual in Ms. Haavistola's position is afforded the protection of Title VII only if she is an employee of a covered employer at the time the allegedly discriminatory action occurs. *See Garrett v. Phillips Mills, Inc.*, 721 F.2d 979 (4th Cir.1983). More recently, however, some courts have interpreted the scope of Title VII's protection more broadly. These courts have held that, once an employer is "covered" by the Act, its protection extends to any aggrieved individual, whether or not a "traditional" employment relationship exists, as long as " 'a relationship of some kind, actual or potential, *with some employer* [exists], since the discrimination forbidden relates to the field of employment.' " *Graves v. Women's Professional Rodeo*, 708 F.Supp. at 235, *quoting* Larson, *Employment Discrimination* § 5.21 at 2–9 (1988). *See also Sibley Memorial Hosp. v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973); *Beverley v. Douglas*, 591 F.Supp. 1321, 1327 (S.D.N.Y.1984). *Vakharia v. Swedish Covenant Hosp.*, 765 F.Supp. at 463–66 (defendant's interference with plaintiff's employment relationship with third party can be predicate for Title VII liability). Such an analysis does not apply in the present case, however, because plaintiff alleges that each of the Fire Company's members, including herself, is an employee to be included in the requisite number of employees required for the Fire Company to be considered a Title VII "covered" employer.[6] For purposes of this case, then, this Court must determine if the volunteer members of the Rising Sun Fire Company are Title VII employees.

Determining whether the members are engaged in an employment relationship with the Fire Company is a fact-intensive inquiry. *Vakharia v. Swedish Covenant*

*Hosp.*, 765 F.Supp. at 468. Plaintiff argues that the proper focus of the "employer/employee" analysis should not be upon the work of the members but rather upon the Fire Company itself. (See Pl.'s Opp'n at 5.) Plaintiff further contends that the Fire Company is a Title VII employer because its members are trained, controlled and disciplined by it and are therefore its Title VII "employees." While plaintiff acknowledges that the Fire Company's members are not paid, she asserts that the members provide services to the Fire Company in return for "substantial work-related compensation." (Pl.'s Opp'n at 12.)

Plaintiff further maintains that a central issue in determining whether an individual qualifies as a Title VII "employee" is the extent to which the putative employer has the right to control its workers. Haavistola contends that the Fire Company exerts considerable control over its members as they perform in a firefighting or emergency paramedic capacity. (Pl.'s Opp'n at 14–15.) Under the line of precedent cited by the plaintiff, a court should examine both "the economic realities of the relationship viewed in light of the common law principles of agency *and* the right of the employer to control the employee" to determine if an individual is a Title VII employee. *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341 (11th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982) (finding no "reversible error" in district court's determination that corporation's former janitor/custodian was an independent contractor—not an employee—and therefore not subject to Title VII protection).

In support of her position, the plaintiff specifically cites this Court to *Garrett v. Phillips Mills, Inc.*, 721 F.2d 979 (4th Cir. 1983), a case construing the term "employee" in the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34 (West 1976 and Supp.1981).[7] *Garrett* concerned allegations of age discrimination by

---

6. Specifically, plaintiff is not alleging that, while she did not have a traditional employment relationship with the Fire Company, such a relationship does exist with respect to fifteen (15) others, therefore potentially subjecting the Fire Company to *Sibley*-type liability.

7. The *Garrett* court was construing a subsection of the ADEA, the operative language of which is identical to § 2000e–2(a)(1).

a former salesman/executive, terminated at age fifty-seven, against the corporation whose upholstery fabrics he had sold. *Id.* at 980. After plaintiff Garrett testified at trial, the district court concluded he was an independent contractor, not an employee, at the time of his termination. Thus, the trial court dismissed his suit as outside the realm of the ADEA's protection. *Id.* On appeal, Garrett argued that the district court erred in finding that he was not an employee, as defined by the ADEA. *Id.*

Following the approach of "most courts deciding the issue of employee status in Title VII cases," the Fourth Circuit rejected a strict right-to-control test and instead utilized a combination of both the "economic realities test"[8] and the common law right-of-control test to determine whether plaintiff Garrett was an employee. *Id.* at 981. Under the test adopted by the *Garrett* court, control is still the most important factor to determine if an employer/employee relationship exists, but it is no longer dispositive. Other important factors to be considered include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 982, *quoting Spirides v. Reinhardt,* 613 F.2d 826 (D.C.Cir.1979). *See generally Cobb v. Sun Papers, Inc.,* 673 F.2d at 340–41. *But see Vakharia v. Swedish Covenant Hospital,* 765 F.Supp. at 467 (questioning the validity of the *Spirides* hybrid test outside the federal employment context for which it was designed). Applying the above criteria to the facts found by the district court, the *Garrett* court affirmed the lower court's determination that plaintiff Garrett was an independent contractor and thus fell outside the protection of Title VII. *Id.* at 982.

Plaintiff Haavistola asserts that application of the *Garrett* factors to the facts here clearly indicates that the Fire Company's members, including the plaintiff, are "employees" under Title VII. Specifically, the plaintiff contends that the control and supervision the Fire Company asserts over the manner and detail of the Company members' training and performance, as well as the Company's criteria for inclusion and/or suspension from the group are sufficient indicia of control to satisfy *Garrett.* (Pl.'s Opp'n at 14–15.) Additionally, as noted above, the plaintiff argues that Fire Company members receive substantial nonmonetary compensation for their service. (Id. at 15–16.)

Plaintiff's attempts to equate membership in a volunteer fire department with the relationship existing between an employer and an employee, in a commercial setting, or even to characterize this as an "employment-type" relationship at all, are ineffectual. It is true that *Garrett* set forth a standard for determining whether an individual was a Title VII "employee," but that case was concerned with the distinction between an "independent contractor" and an employee. *See also Tarboro v. Reading Co.,* 396 F.2d 941 (3rd Cir.1968), *cert. denied,* 393 U.S. 1027, 89 S.Ct. 637, 21 L.Ed.2d 569 (1969); *Vakharia v. Swedish Covenant Hosp.,* 765 F.Supp. at 466–67. This Court notes that the judiciary has turned to analyses such as the "economic

---

8. Under a pure economic realities test, courts are required to examine "whether the defendant can subject the plaintiff 'to the discriminatory practices which the act was designed to elimi- nate.'" *Vakharia v. Swedish Covenant Hosp.,* 765 F.Supp. at 465, *quoting Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir.1983).

realities" test and "right-to-control" test and, as in *Garrett*, a hybrid of the two, only in situations that plausibly approximate a traditional commercial relationship. The tests formulated were based upon a basic premise that was little doubted: an individual (or organization) was compensating another for services performed at his (or the organization's) behest. *See Graves v. Women's Professional Rodeo*, 907 F.2d at 73 ("an employer is someone who pays, directly or indirectly, wages or a salary or other compensation to the person who provides service—that person being the employee. Compensation by the putative employee in exchange for his services is not a sufficient condition, but it is an essential condition to the existence of an employer-employee relationship.") That such formulae should not be easily transferred into the context of volunteer service is unsurprising, because the underlying motivation for the worker is different: she is serving her community, not trying to make a living. This Court will not attempt to fit those activities performed by volunteer members of a Fire Company into formulae designed for contexts in which all concerned were aware that the individuals were paid (and thus "employed") by someone, with the central disputed issue being simply by whom they were so employed.

Assuming that the *Garrett* test can be applied in the present context, consideration of the relevant *Garrett* factors convinces this Court that the relationship between the Fire Company and its members is not one of employment.

As an initial matter, Haavistola argues that the work of the Fire Company's members is conducted under the direction of a supervisor and is strictly controlled by the rules and regulations of the organization. (See Pl.'s Opp'n Ex. 6.) It is quite true that firefighting and rescue runs cannot take place without adequate supervision. As the defendants correctly state, the rules of operation under which the volunteer members of the Fire Company toil are necessary to carry out the Fire Company's function in an orderly fashion. The Fire Company's Law XXII provides that violation of the rules of the Company will result

in unspecified disciplinary action taken against the transgressing member. (Pl.'s Opp'n Ex. 6.) These rules are, however, only operative once an individual has voluntarily chosen to tender his or her services to the Fire Company. The plaintiff does not, and presumably cannot, argue that individual members are not free to cease to volunteer at any time. It would border upon the absurd to argue that because an organization has rules by which its members must abide, the control exercised over members in enforcing those rules leads to an employer/employee relationship. The very nature of the individual volunteer's service is such that the Fire Company does not know which volunteers will respond to a particular emergency call, further diminishing the Fire Company's control over any given member.

Haavistola next argues that the skill required of the individual members as well as the training and equipment provided by the Fire Company are further evidence that a Title VII employer/employee relationship exists here. It is true that class participation and training are required of Fire Company members. (See Pl.'s Opp'n Ex. 6.) Such training is necessary to insure the individual's proficiency on and with the firefighting and emergency equipment owned by the Fire Company. The same could be said for any volunteer activity which requires the participants to perform a skill not within the knowledge base of the average lay person, using "equipment" that the individual did not bring with him or her: be that volunteering at a school as a teacher or at a public health clinic as a health care professional. Merely because the individuals are required to maintain a particular level of proficiency does not mean that they are "employed" to do so.

Further, plaintiff Haavistola argues that the Fire Company's members are "substantially" compensated for their service to the community. The parties agree that the members receive *no salary* for their efforts, nor, as a consequence, are they eligible for "retirement benefits." Due to the hazardous nature of the services they perform, however, Fire Company members are

entitled to certain statutory benefits, should they be injured or killed while "on duty."[9] Again, the existence of these statutory gratuities does not transform the association between the Fire Company and its members into an employment relationship. Providing protection should one become injured while on duty is an incentive to volunteer one's service for the benefit of the community, not just for the benefit of the "employer." In no way, however, could these state-law based "benefits" be considered compensation for the services performed by the volunteers. If all goes as planned and no firefighters or emergency personnel are injured or killed, the volunteers (and their families) will never receive the "compensation in exchange for services" which the plaintiff contends qualifies the Fire Company as an employer. Rather, these benefits are more accurately referred to as death or bodily injury gratuities.

The only true compensation cited by the plaintiff involves tax exemptions for unreimbursed auto travel expenses for Fire Company service, Md. Tax–General Code Ann. § 10–207, the ability to purchase, without paying extra fees, special commemorative registration plates for private automobiles, Md.Transp.Code Ann. § 13–618, and tuition reimbursement for courses in emergency medical and fire service techniques, Md.Educ.Code Ann. § 18–605. Any remuneration for such emergency procedure coursework is part of the training necessary for the members to perform the services required to be effective volunteers. Residual benefits might well result from such education, e.g., paramedic qualification, but the fact that such benefits could accrue is not sufficient compensation to make Haavistola or the other members

Fire Company employees. The Fire Company's members are not economically dependent upon the possible or actual accrual of the statutory benefits cited by the plaintiff. Nor—no matter how attractive the license plates might be—does this Court find that the volunteer emergency personnel are motivated by compensation. In fact, the volunteers give up time that could be devoted to income-producing activities—ranging from farming to surgery—to serve as Fire Company members.

Applying the *Garrett* test to the facts of this case, the affiliation between the Fire Company and its members does not constitute an employer/employee relationship. Because the volunteer members of the Fire Company are not considered Title VII employees, and the Fire Company is not alleged to be providing compensation (employing) at least fifteen non-volunteers, the Fire Company is not a Title VII "covered" employer. As such, plaintiff Haavistola is not entitled to Title VII remedies.

The plaintiff offers several alternative grounds upon which this Court could find the existence of Title VII liability in the present case. Despite the absence of payment of a salary, Ms. Haavistola argues that the members are economically dependent upon the experience they obtain through association with the Fire Company. Specifically, Haavistola contends that the "economic reality/dependence" test, articulated in *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), is satisfied here because the volunteer members depend upon the Fire Company for training to become Emergency Medical Technicians–Paramedic ("EMT–P"s). According to the plaintiff, the level of experience (150 ambulance runs)[10] required to achieve EMT–P certification in Maryland

**9.** See Pl.'s Opp'n at 15–16 (volunteers (1) are covered by Workers Compensation Act, Md. Ann.Code of 1957 art. 101 § 21(b); (2) are eligible for group life insurance, Md.Ann.Code art. 48A § 425; (3) receive state-funded disability pensions, Md.Ann.Code art. 25 § 32.5; (4) are eligible for $50,000 cash and lifetime pension survivor benefits for dependents, Md.Ann.Code art. 38A § 42A and art. 41 § 4–1002; (5) are eligible for scholarships for their children upon their disability or death, Md.Ann.Code art. 38A § 42B and Md.Educ.Code Ann. §§ 18–601, 18–

602; (6) are eligible for benefits under Federal Public Safety Officers' Benefits Act when on duty, Md.Ann.Code art. 38A § 45; and (7) receive a state flag for their family when killed in the line of duty, Md.Ann.Code art. 38A § 44.)

**10.** In her deposition, Ms. Haavistola indicated that she had only been on three "runs" with the Fire Company prior to the incident. (Pl.'s Opp'n Ex. 1 at 302.)

can only be obtained "through affiliation with a volunteer fire company." Membership in a Fire Company, plaintiff argues, "is essentially a prerequisite to certification as a paramedic," the absence of which "may ruin [plaintiff's] chances of attaining certification in her chosen career." (Pl.'s Opp'n at 20–21.)

Contrary to plaintiff's assertions, membership in the Company is not a prerequisite to certification as a paramedic.[11] While discrimination against a Fire Company member, should a court find such discrimination to exist, might remove one (or several) options for obtaining the requisite experience to qualify for paramedic certification, such discrimination would not ruin a [plaintiff's] chances of attaining certification in her chosen career. Thus, members of a fire company are not "uniquely vulnerable to the discriminatory [employment] practices" for which Title VII was enacted. *Smith v. Berks Community Television,* 657 F.Supp. at 795.

Further, each of the members of the Fire Company is acknowledged by all parties to be a volunteer. The case law in this area clearly indicates that unpaid volunteers, such as the members of the Fire Company, are not to be considered "employees" for Title VII purposes. *Smith,* 657 F.Supp. at 795–96; *Tadros v. Coleman,* 717 F.Supp. 996, 1004 (S.D.N.Y.1989), *aff'd,* 898 F.2d 10 (2d Cir.1990), *cert. denied,* 498 U.S. 869, 111 S.Ct. 186, 112 L.Ed.2d 149, *rhg. denied,* 498 U.S. 995, 111 S.Ct. 550, 112 L.Ed.2d 558 (1990). *Cf. Graves v. Women's Professional Rodeo,* 907 F.2d at 72–74 (members of a voluntary organization whose members pay dues are not Title VII "employees"). Title VII does not cover such volunteers because "unpaid volunteers are not susceptible to the discriminatory practices which the Act was designed to eliminate." *Smith,* 657 F.Supp. at 795. As the *Tadros* court noted:

> Congress has limited the employment discrimination statutes by excluding volunteers from the statutes' scope. Volunteers usually work under their supervisors' control, but they do not—by definition—get paid. Because they are not "economically dependent on the business to which [they] render[ ] service," *Doty v. Elias, supra,* 733 F.2d [720] at 722–23 [ (10th Cir.1984) ] volunteers cannot invoke the remedies of Title VII.... *Smith v. Berks Community Television,* 657 F.Supp. 794 (E.D.Pa.1987); *see also Schoenbaum v. Orange County Center for the Performing Arts, Inc.,* 677 F.Supp. 1036 (C.D.Cal.1987); *cf. Alcena v. Raine,* 692 F.Supp. 261, 270 (S.D.N.Y. 1988) ("it is questionable whether there are any damages available under Title VII for a volunteer, nonpaying position")....

717 F.Supp. at 1004.

The Court is well aware that volunteer service performed by the members of the Fire Company is qualitatively different than that performed by a volunteer for a television station, as was the plaintiff in *Smith,* or that performed by a Visiting Lecturer, as was the plaintiff in *Tadros.* Plaintiff's attempts to distinguish these cases, however, are unavailing, for the relationship of the volunteer members to the

---

**11.** The plaintiff appears to over-emphasize the necessity of affiliating with a Fire Company in order to obtain the training necessary to become a Maryland EMT–P. Pursuant to Maryland Department of Health and Mental Hygiene Program Standards Manual Section 1.1.2, an individual over eighteen (18) years of age may acquire initial EMT–P certification in one of two ways: (1) by obtaining one full year of continuous experience in providing pre-hospital emergency care (as an EMT–A) immediately prior to application for certification or (2) by completing at least 150 emergency ambulance runs providing pre-hospital emergency care during the year immediately prior to application for certification as an EMT–P. (See Pl.'s Ex. 4 at 50.) It is apparent that, should the plaintiff wish to pursue EMT–P certification, she has two options for gaining the necessary experience— neither of which, from this Court's reading of those regulations submitted to it, require her to work at a volunteer fire department. To the extent, therefore, that the plaintiff contends that she is *uniquely* dependent upon experience gleaned as a member of a volunteer fire department in order to pursue her career goal, this Court rejects her argument. In analyzing whether or not Haavistola was a Title VII "employee," this Court will only take into consideration the fact that Haavistola could, but was *not required to,* use her Fire Company experience to obtain EMT–P certification.

Fire Company is more closely analogous to traditional "volunteer" status than it is to employment. It is true that the volunteer plaintiffs in *Smith* and *Tadros* and the applicant for membership in *Graves* had no "duty of service" to the defendant organizations against which they filed suit. The members of the Fire Company, in contrast, by the very nature of the tasks which they discharge, are constrained in the type, manner, and place of performance of their duties. Further, these individuals do indeed have a "duty" to perform their tasks in a competent and professional manner for the good of the community which they serve. The stakes are indeed high, and volunteer rescue workers provide invaluable aid to the communities which they serve. Any so-called duty to which the members of the Fire Company here are held, however, was entered into freely and can just as easily be abandoned, should the member no longer choose to serve. Mere references to the emergency technicians "duty" to do their job well do not turn volunteer service into an employment relationship.

From the lack of further elaboration of the term "employee" in the statutory definition, as well as its examination of the case law in this area, this Court is confident that Congress intended the term "employee" to be given its common, ordinary meaning, because " 'legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him.' " *Cobb*, 673 F.2d at 339, *quoting Addison v. Holly Hill Fruit Products*, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944). *See also Graves v. Women's Professional Rodeo*, 907 F.2d at 73 (citing legislative history providing that the dictionary definition should govern the interpretation of "employer" under Title VII.) One who volunteers, and therefore donates her time, is widely understood to be the opposite of one who is employed, and is compensated for her time.

Finally, plaintiff's attempt to analogize Title VII "employer/employee" status with state cases holding that volunteer fire department members were "employees" under *state* statutes is unavailing, because these statutes do not mirror Title VII's provisions. In *Harmony Volunteer Fire Company and Relief Assoc. v. Pennsylvania Human Relations Commission*, 73 Pa.Commw. 596, 600, 459 A.2d 439, 442 (Pa.Commw.Ct.1983), for example, the statutory definition of an "employer" included any person employing four or more persons within the Commonwealth. Because the Pennsylvania Human Relations Act did not define the term "employment" and the duty to pay a salary was not a prerequisite to employer status under applicable state law, the *Harmony* court relied upon common law concepts of master/servant relations to determine that the Harmony Fire Company was an "employer" of its members. *Id.* 459 A.2d at 442, 73 Pa.Commw. at 600. As the plaintiff is aware, this strict common law approach was rejected by the *Garrett* court when it applied the *Spirides* hybrid test to determine employer/employee status. As discussed *infra*, this court found that the relationship between the Fire Company and its members did not satisfy the *Garrett* test. *See also Hebard v. Basking Ridge Fire Co. No. 1*, 164 N.J.Super. 77, 395 A.2d 870 (N.J.Super 1978) (both the fire company *and* the township were found to be "employers" of volunteer fire department members and thus subject to New Jersey Law Against Discrimination.) Plaintiff's effort to convince this court that it should interpret Title VII law in line with the state cases she cited is wholly unpersuasive.

Title VII is inapplicable if the defendant entity does not have the requisite number of qualified employees for Title VII coverage. *See* 42 U.S.C. § 2000e(b). Based upon the above analysis, there is no genuine dispute of material fact that the Fire Company does not have fifteen (15) or more "employees," as that term is defined in Title VII. Because volunteers are not considered "employees" under Title VII, the Fire Company is not a "covered" Title VII employer, nor are its volunteer fire and emergency personnel entitled to its protec-

tion. Thus, this Court does not have subject matter jurisdiction to hear the plaintiff's allegations in this context, and Ms. Haavistola cannot recover under Title VII's provisions because she falls outside of its protection. Defendants' motion for summary judgment as to Ms. Haavistola's Title VII claims (Counts XII and XIII) is, therefore, *granted.*

### B. § 1983 Claims

Ms. Haavistola also alleges injury, pursuant to 42 U.S.C. § 1983, for violations by the defendants of her equal protection, property, and liberty rights under the Fourteenth Amendment. (See Counts I, II, and III of the First Amended Complaint.) Specifically, plaintiff alleges that she was placed upon indefinite suspension from the Fire Company without due process of law, and as a consequence, she was deprived of the opportunity to continue training in her chosen profession. Further, plaintiff contends that the Fire Company published false and stigmatizing statements regarding the basis for her discharge and the level of support she would receive from Fire Company members should she be reinstated. (Id.)

When a plaintiff alleges a claim pursuant to § 1983,[12] the court must conduct a two part inquiry to determine: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978). As the court noted in *Krieger v. Bethesda-*

*Chevy Chase Rescue Squad,* 599 F.Supp. 770 (D.Md.1984), *aff'd,* 792 F.2d 139 (4th Cir.1986) (table), § 1983 applies only to actions committed by a person under color of state law, and not to the acts of private individuals or organizations. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). "The ultimate issue in determining whether a [private entity] is subject to suit under § 1983 is ... [whether] the alleged infringement of federal rights [is] 'fairly attributable to the State.' " *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). If the Fire Company's actions are fairly attributable to the state, Ms. Haavistola has satisfied the first prong of § 1983.[13] It is, therefore, precisely the question of whether or not the Fire Company was a "state actor" when it placed the plaintiff on indefinite suspension that is at the heart of this summary judgment motion. *See Rendell–Baker v. Kohn,* 457 U.S. at 830, 102 S.Ct. at 2764.

In his decision regarding the present defendants' preliminary motion to dismiss, Judge Ramsey discussed at length the Fourth Circuit's opinion with respect to volunteer fire departments in *Adams v. Bain,* 697 F.2d 1213 (4th Cir.1982). *Adams* involved plaintiffs' appeal from the trial court's dismissal of their § 1983 claims, under Fed.R.Civ.P. 12(b)(1), (2) & (6). The plaintiffs alleged that they suffered injury as a result of their unconstitutional removal from positions as volunteer fire fighters in York County, Virginia. 697 F.2d at 1215. Specifically, the *Adams* plaintiffs contended that they were dismissed from membership in the fire department because of their actions at a public meeting. *Id.* at

---

**12.** 42 U.S.C. § 1983 provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**13.** The Supreme Court in *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 102 S.Ct. 2744, 73

L.Ed.2d 482 (1982) held that fulfillment of the *Fourteenth Amendment's* requirement for "state action" necessarily also satisfied § 1983's second requirement that the complained of conduct be committed "under color of state law." *See also Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982) (in § 1983 cases, the phrase "under color of law" has been treated as the same thing as "state action" required under the Fourteenth Amendment).

1216–17. The *Adams* court determined that the issue of whether a volunteer fire department was a "state actor" involved questions of fact, not resolvable on the pleadings alone, precluding a Rule 12(b)(1) or (b)(6) dismissal. *Adams*, 697 F.2d at 1219. Therefore, the Fourth Circuit reversed the district court's ruling and remanded the case to the court below. *Id.* at 1220.[14]

■ The present case, in contrast to *Adams*, is before this Court on a motion for summary judgment. The difference in the procedural posture of the current action limits *Adams'* application here. It is quite clear from the language of *Adams* that determining "[w]hether ... responsibility for public fire protection may be delegated to [a fire department] without that organization becoming a "state actor" requires the application of ... broad but well defined legal principles ... to the particular facts of th[e] case." *Id.* at 1218–19. Here, the Court has considered the settled law regarding what constitutes "state action," and it is left to this Court to apply that law to the facts before it which, with regard to the state action issue, are not in material dispute. As a consequence, because it is the law as applied to the facts that is in dispute here, the issue of § 1983 "state action," while not proper for disposition on a motion to dismiss, is appropriately addressed in this motion for summary judgment. *Krieger v. Bethesda–Chevy Chase*, 599 F.Supp. at 771.

■ Plaintiff Haavistola utilizes several theories in support of her argument that the Fire Company's actions are fairly attributable to the State. She contends that the Fire Company is a "state actor" for Fourteenth Amendment/§ 1983 purposes because (1) the Fire Company is subject to extensive regulation by the State, (2) the Fire Company receives extensive public funding, (3) the Fire Company performs a public function traditionally exclusively reserved to the State, and (4) attributes of sovereignty are attached to the Company's firefighting function. According to the plaintiff, only one of these theories[15] of state action need be satisfied in order to find that the Fire Company is a state actor and thus subject to suit under § 1983. *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65, 69–70 (D.Mass. 1990) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157–66, 98 S.Ct. 1729, 1733–39, 56 L.Ed.2d 185 (1978) as implicitly recognizing that state action could be found under any of the alternative rationales).

This Court does not believe that *Flagg Brothers* tacitly recognized that satisfaction of any one of the "state actor" tests mentioned therein would be sufficient to find § 1983 applicable to the complained of conduct. Rather, this Court notes the comments of the Court in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2754–55, 73 L.Ed.2d 482 (1982), as being pertinent to the analysis here:

[What is necessary to] convert [a] private party into a state actor might vary with the circumstances of the case. ... [T]he Court has articulated a number of different factors or tests in different contexts. ... Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation need not be resolved here. *See Burton [v. Wilmington Parking Authority]* supra, [365 U.S. 715] at 722 [81 S.Ct. 856 at 860, 6 L.Ed.2d 45 (1961)] ("Only by sifting facts and weighing circumstances can the non-obvious involvement of the

---

**14.** As the *Adams* court stated: "[w]e express no opinion on the merits of the appellants' case. It may well be that the actions allegedly taken by York County and the [fire department] were constitutionally permissible. That is an ultimate conclusion that can be reached only after a full trial." 697 F.2d at 1220.

**15.** "These factors 'are not tests in the traditional sense. More precisely, they are different methods of analyzing and appraising the facts and circumstances of a particular case.'" *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65, 69 n. 5 (D.Mass.1990), *quoting Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 449 n. 2 (1st Cir.1983).

State in private conduct be attributed its true significance").

Because courts in this circuit have analyzed the "state actor" question by examining, in sequence, various theories of state action, this Court will likewise address each of Ms. Haavistola's arguments in turn.

### 1. *Symbiotic Relationship*

In her opposition, plaintiff references the "close and cooperative working relationship" that the State of Maryland has maintained with fire companies in general and the Fire Company defendant here in specific. She indicates that this "close nexus" between the State and the Fire Company is evidence that the State has not broken ties with the firefighting services within Maryland. While this Court believes that all of Haavistola's arguments are adequately analyzed under the alternate theories of state action discussed *infra*, the Court notes that her argument could be characterized as supporting the contention that a symbiotic relationship exists between the Fire Company and the State.

In *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961), the Supreme Court found a "symbiotic relationship" between the public parking garage and the privately owned (and segregated) restaurant located within the garage, sufficient for state action. The Supreme Court has limited the holding in *Burton* specifically to a State lessor and private lessee each contributing to the business of the other. *See Rendell–Baker v. Kohn*, 457 U.S. at 832, 102 S.Ct. at 2766. In the present case, both the buildings which house the Fire Company's operations and the fire and emergency rescue equipment are owned exclusively by the Fire Company itself. (Defs.' Mot. for Summary Judgment Ex. 2.) Thus, the Fire Company does not have a symbiotic relationship with the state, county, or local municipality as contemplated in *Burton. See Eggleston v. Prince Edward Volunteer Rescue Squad, Inc.*, 569 F.Supp. 1344, 1349 (E.D.Va.1983), *aff'd*, 742 F.2d 1448 (4th Cir.1984) (table). As a consequence, to the extent the plaintiff may be arguing that the Fire Company is a state actor under the *Burton* test, her argument is unsuccessful.

### 2. *State Regulation*

The plaintiff argues that there are a number of concrete indicia of state involvement with the Fire Company that demonstrate that the defendant Company does not act autonomously. Initially, Ms. Haavistola contends that the Fire Company is subject to regulation by State agencies. Specifically, Md.Ann.Code, art. 38A § 7, establishes the Office of the Fire Marshal whose responsibilities include "the establishment and enforcement of fire safety practices throughout the State, ... [including] coordination of fire safety programs with volunteer and paid fire companies." Additionally, the Maryland State Firemen's Association conducts annual inspections of fire and rescue apparatus, equipment, and facilities, pursuant to Md.Ann.Code, art 46B. Further, required training for the members of the Fire Company is conducted by the Maryland State Fire and Rescue Institute at the University of Maryland. (See Pl.'s Opp'n at 34.) Citing *Edwards v. Maryland State Fair and Agric. Soc'y, Inc.*, 628 F.2d 282 (4th Cir.1980), Haavistola contends such regulation is an example of Maryland's involvement in the conduct of the Fire Company and is thus an example of the Company's status as a "state actor."

The Supreme Court has noted that even "extensive and detailed" regulation of a private entity by the State is insufficient, by itself, to establish State action. *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 350, 95 S.Ct. at 453. Instead, " 'the inquiry must be whether there is a sufficiently close nexus between the State *and the challenged action of the regulated entity* so that the action of the latter may be fairly treated as that of the State itself.' " *Eggleston v. Prince Edward Volunteer Rescue Squad*, 569 F.Supp. at 1349, *quoting Jackson*, 419 U.S. at 351, 95 S.Ct. at 453. (emphasis added).

Here, as was the case in *Krieger v. Bethesda–Chevy Chase, supra*, no regulation has been presented by the plaintiff "that even remotely promotes curtailment

of free speech or due process, or influences decisions to [suspend volunteer members]." 599 F.Supp. at 774. The Fire Company's decision to suspend Ms. Haavistola was not made in obedience to, as a consequence of, or as encouraged by state regulation. As a consequence, the regulation of the Fire Company by the State of Maryland is inadequate to establish state action.

### 3. *Government Support or Funding*

Ms. Haavistola also sets forth a variety of means by which the State of Maryland and the local municipality, the Town of Rising Sun, financially support the Fire Company as evidence of her contention that the defendants are liable under § 1983 as state actors. At the outset of this phase of the analysis, it is important to note what the State and municipal governments here do *not* support. Unlike many of the volunteer fire departments in the cases cited by the plaintiff, the Fire Company owns both the land and the two buildings which house its firefighting and rescue equipment, as well as its offices. Further, the Company owns its firefighting and ambulance/rescue vehicles and equipment. (Defs.' Mot. for Summary Judgment Ex. 2.) The Fire Company enacts its own rules and regulations with respect to its operation and holds its own elections without governmental assistance. Finally, neither the Fire Company's elected officials nor its general membership is subject to the approval of any governmental authority. (Id.) Pursuant to Md. Ann.Code, art. 38A § 45B, however, the Fire Company does receive state funding for fire protection services. Payments under this statute are made to each county, which disburses the funding to fire companies for the purchase of equipment and maintenance of facilities. (Id.) Funds distributed to fire companies under this statute are conditioned upon compliance with the requirement that they be audited and copies of those audits be submitted to a State agency. Md.Ann.Code, art. 38A, § 46C. Pursuant to Cecil County Code §§ 37–1(F)–(G) (1988), the Fire Company must also file annual financial statements with the Board of County Commissioners. (Pl.'s Opp'n at 35.) Further, funds dis-

bursed to fire companies by any State agency are conditioned on the recipient not engaging in discriminatory practices, Md.Exec.Order No. 1988–05, Md.Admin.Code 01.01.1988–05 (1988). Cecil County funds are conditioned upon the Fire Company meeting "minimum specifications and standards approved by the Cecil County Firemen's Association (itself a private group)."

In total, the Fire Company receives approximately $90,000 per year in public funding from Cecil County and has, prior to state budget cuts, received approximately $10,000–12,000 per year from the State of Maryland, although that amount has been reduced to approximately $6,000–8,000 in recent years. (Pl.'s Opp'n at 34.) Further, the Fire Company receives free water from the Town of Rising Sun, and the town also contributed $2,500 as a "special donation" to the Fire Company in 1990. (Pl.'s Opp'n at 35.) Finally, in addition to those benefits provided by the State of Maryland to the individual members, *see* discussion *supra* at 1386–87, Cecil County pays pension plan benefits for members of the Fire Company. (Pl.'s Opp'n at 35.)

Plaintiff maintains that this state and municipal support accounts for 20–40% of the Fire Company's annual operating budget, depending upon the year. (Pl.'s Opp'n at 35.) This level of funding, contends Ms. Haavistola, is evidence of state involvement in the Fire Company sufficient to predicate liability under § 1983. *See, e.g., Edwards v. Maryland State Fair*, 628 F.2d at 282; *Janusaitis v. Middlebury*, 607 F.2d 17, 21–24 (2d Cir.1979).

The Court, as it must, accepts the noncontroverted statements of financial support alleged by the plaintiff. Further, it acknowledges that, unlike the situation in *Krieger*, 599 F.Supp. at 775, the defendant Fire Company does receive substantial funding from the State and County governments, and that government funding and ownership of fire company property have often been considered important factors in determining state action. *See, e.g., Janusaitis*, 607 F.2d at 21–24. The factual scenario before this Court, however, is most

closely analogous to that found in *Eggleston v. Prince Edward Volunteer Rescue Squad,* 569 F.Supp. at 1344.

*Eggleston* concerned the dismissal of a black member of the Prince Edward Volunteer Rescue Squad, allegedly due to his airing of a grievance (to the County Board of Supervisors) relating to a racial epithet used by one of his fellow volunteers. *Id.* at 1346. The defendant Rescue Squad provided emergency medical transportation but did not offer fire protection services. *Id.* The plaintiff in *Eggleston* filed a § 1983 complaint against the Rescue Squad, contending that the defendants acted under color of state law in dismissing him. As is the case in the present litigation, neither the County nor the State controlled the internal operation or membership activities of the defendant Rescue Squad. *Id.* at 1347. Unlike the present case, however, the defendant in *Eggleston* did not receive state funding, nor were its volunteers covered by workers' compensation. *Id.* at 1347.

One of several theories used by the *Eggleston* plaintiff in an attempt to satisfy the "state action" requirement of § 1983 was the amount of governmental support received by the defendant Rescue Squad. *Id.* at 1351. The Rescue Squad received a number of benefits from the county and town it served, including funding from the county; matching funds from the federal government (distributed through a private entity) for equipment purchases; gasoline, water, and dispatching service from the town; tax exemptions for its real and personal property; and free private vehicle stickers for Rescue Squad members. *Id.* After a discussion of the relevant Fourth Circuit and Supreme Court precedent on the issue of financial support, the *Eggleston* court held that the general funding

and assistance received by the Rescue Squad from the government was insufficient to turn the defendant into a "state actor." *Id.* at 1351. This Court's analysis of the situation here leads to a similar result.

While the defendant Fire Company does receive significant assistance from the County and State governments, such funding is insufficient to constitute it as a governmental actor. The Fire Company operates as a private, non-profit corporation. The vast majority of its funding comes from private sources, including fundraisers such as casino night and bingo. (See Pl.'s Opp'n Ex. 7.) As the Supreme Court noted in *Blum v. Yaretsky,* 457 U.S. 991, 1011, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), a case where a state was indirectly involved in the challenged decisions to transfer nursing home patients to less expensive facilities, the court's inquiry into monetary assistance should not focus upon the quantity of the funding, but rather upon its nature and scope.[16] "There must be a clear connection between the public funding of the private entity and the complained of expulsion of the plaintiff." *Krieger v. Bethesda–Chevy Chase,* 599 F.Supp. at 775.[17] No such clear connection is present here.

This Court acknowledges that *Eggleston* involved an emergency medical rescue squad rather than a volunteer fire company. Nonetheless, this court finds the logic and Supreme Court precedent cited by both *Eggleston* and *Krieger* with respect to the funding to be highly persuasive. In the present case, this Court has no evidence before it of any connection between the defendant Fire Company's decision to place Ms. Haavistola on indefinite suspension and the public funding of the Fire Compa-

---

**16.** As the *Blum* court commented:

> That programs undertaken by the state result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the state is responsible for decisions made by the entity in the course of its business.

457 U.S. at 1011, 102 S.Ct. at 2789, *cited in, Eggleston,* 569 F.Supp. at 1351.

**17.** *But see Janusaitis,* 607 F.2d at 22–23 (volunteer fire department defendant was found by the Court, by virtue of its function, relationship to town, and town funding, to be a state actor; therefore, although town had never taken active part in disciplinary proceedings of fire department, department's dismissal of fireman constituted state action).

ny.[18]  As a consequence, the plaintiff has not established that the Fire Company is a state actor through her "government funding" argument.

### 4. Public Function

Finally, Haavistola maintains that the Fire Company is a state actor because it performs the public function of firefighting.  She argues that, when a private entity exercises a function or power that traditionally has been associated with the sovereignty of a state, and, in the performance of that function violates an individual's Constitutional rights, the action of the private party may be fairly attributed to the state.  (Pl.'s Opp'n at 26.)  See Adams, 697 F.2d at 1218.  This analysis is known as the "public function" test.

"The telling question under this standard is not simply whether a private entity is serving a public function but whether the private entity is performing a function that is "traditionally the exclusive prerogative of the State.'"  Eggleston v. Prince Edward Volunteer Rescue Squad, 569 F.Supp. at 1350, quoting Jackson v. Metropolitan Edison Co., 419 U.S. at 353, 95 S.Ct. at 455.  The key component of this analysis is the exclusivity of the state's participation in the act.  Rendell–Baker v. Kohn, 457 U.S. at 842, 102 S.Ct. at 2772; Flagg Bros., Inc. v. Brooks, 436 U.S. at 158, 98 S.Ct. at 1734 ("While many functions have been traditionally performed by governments, very few have been "exclusively reserved to the State.").

Flagg Brothers involved "the field of private commercial transactions," which the Court found were not within the exclusive province of the state.  In dictum, however, the Flagg court did note a "number of state and municipal functions ... which have been administered with a greater degree of exclusivity by States and municipal-

ities," including fire protection.  436 U.S. at 163, 98 S.Ct. at 1737.[19]  Plaintiff argues that, because Flagg noted that fire protection was more likely to be, generically, an exclusive "state function" than was an ordinary commercial transaction, the Fire Company here is engaged in the "public function" of firefighting and thus exposed to liability under § 1983.

At the outset, the Court notes that the plaintiff is correct in focusing upon the actions of the Fire Company and not merely upon the Ambulance Section of the Company, despite the fact that the plaintiff's work and training within the organization was solely that of an ambulance aide.  (Defs.' Mot. for Summary Judgment Ex. 2.)  For purposes of the public function analysis, the status of the suspending entity should be examined.  Here, the plaintiff sued the Fire Company and the individual members of its Board of Directors.  Indeed, the Ambulance Chief is a defendant in this case only in her capacity as a member of the Board of Directors.  Haavistola did not limit her complaint merely to the subsidiary Ambulance Section, and the defendants' concerted efforts to convince this Court that only the functions of that section of the Company should be examined are unavailing.

The Court does note, of course, that the plaintiff herself, in the three emergency runs in which she participated, never engaged in the type of firefighting activities that have been associated with state action; instead, her activities were in connection with an activity that has been found not to be a "public function."  See Eggleston, 569 F.Supp. at 1351.  Nonetheless, the defendants are ill-served in placing such undue emphasis in their papers upon a distinction which the Court finds to have little, if any, legal relevance to the analysis of the "state actor" issues in the case before this Court.  It is with this deficiency in the defendants'

---

**18.**  Indeed, a portion of the state funding was contingent upon the Fire Company's not engaging in discriminatory practices.  (Pl.'s Opp'n at 35.)

**19.**  The Flagg court "express[ed] no view as to the extent, if any, to which a city or State might be free to delegate to private parties the perfor-

mance of such functions and thereby avoid the strictures of the Fourteenth Amendment.  The mere recitation of the[ ] possible permutations and combinations of factual situations suffices to caution us that their resolution should abide the necessity of deciding them."  436 U.S. at 163–64, 98 S.Ct. at 1737.

argument in mind, that this Court will proceed with its "public function" analysis.

In addition to *Flagg Brothers, supra,* plaintiff cites this Court to several cases from this circuit and elsewhere, which she contends indicate that the Fire Company here was executing a "public function." *See, e.g., Krieger v. Bethesda–Chevy Chase,* 599 F.Supp. at 773 ("[u]nquestionably, firefighting is traditionally an exclusively public function."); *Everett v. Riverside Hose Co. No. 4, Inc.,* 261 F.Supp. 463, 468 (S.D.N.Y.1966) ("... a voluntary fire department is performing a function *normally* governmental in nature"); *Williams v. Rescue Fire Co.,* 254 F.Supp. 556 (D.Md. 1966); *Janusaitis v. Middlebury Volunteer Fire Dept.,* 607 F.2d at 22–25 (finding that fire protection is a function "so traditionally associated with sovereignty that its performance, even by an otherwise 'private' entity, constitutes state action.") *See also Kronmuller v. West End Fire Co. No. 3,* 123 F.R.D. 170 (E.D.Pa.1988). The present case can be easily distinguished from the cases cited by the plaintiff in support of her "public function" theory.

When examined carefully, the cases cited by the plaintiff do not stand for the proposition that firefighting is always or exclusively a governmental function. First, the *Krieger* court, in an opinion holding that the function of an emergency medical rescue squad was *not* one exclusively reserved to the states, offered no case support for the bald statement that "firefighting is traditionally an exclusively public function." 599 F.Supp. at 773. Thus, this Court is left to wonder how, or, if at all, the *Krieger* court made the necessary "exclusivity" inquiry under *Jackson, Rendell–Baker,* and *Flagg Brothers.* It would seem that the *Krieger* court should have determined how the Maryland courts have viewed the firefighting protection function; however, this Court has no indication that it did so.[20] Rather, it appears ·that the *Krieger* court, in *dicta,* merely attempted to distinguish what it saw as a clear case of the state's *non-exclusivity* in the provision of emergency medical services, from the arguments offered in support of the defendant emergency rescue squad's connection with a fire company.

Second, the *Everett* and *Williams* opinions involved racial discrimination in the application for membership in a volunteer fire department and in the use of a fire department's facilities. In specific, *Williams* was a public accommodation case. The black citizens of Cambridge, Maryland brought a class action suit to enjoin the segregation of a community arena and swimming pool operated by the Rescue Fire Company ("RFC"). 254 F.Supp. at 557. The RFC was a nonprofit corporation which operated as the fire department for the City of Cambridge and a portion of Dorchester County, Maryland. *Id.* at 558. The Company's operations were extensively intertwined with the City government, and the defendants did not deny that, with respect to firefighting, the RFC was an agency of the City. *Id.* As the official fire

---

**20.** In determining whether fire fighting has traditionally been considered the exclusive province of the State of Maryland, this Court may appropriately look to Maryland case and statutory law. In *Annapolis v. West Annapolis Fire and Improvement Co.,* 264 Md. 729, 737, 288 A.2d 151, 155 (Md.1972), the Maryland Court of Appeals, in *dicta,* noted "a volunteer fire company ... performs services *usually* regarded as a function of the government." (*citing Williams v. Rescue Fire Co.,* 254 F.Supp. 556.) The volunteer fire company in *Williams* was an agent of the city which it served. 254 F.Supp. at 558. Thus, *Williams'* force as support for the proposition that a volunteer fire company, such as the defendant here, is exercising a function *exclusively* reserved to the state is minimal. Further, the plaintiff cites this Court to *Utica v. Gaithers–Washington Grove Fire Dept.,* 53 Md.App. 589, 596, 455 A.2d 987, 991, *cert. denied,* 296 Md. 224 (1983). In *Utica,* the Court of Special Appeals reversed a judgment n.o.v. concluding that there was insufficient evidence to support a finding that the volunteer fire department at issue was a governmental agency. The *Utica* court simply noted that firefighting was a *governmental* function (as opposed to a proprietary function) for which immunity *could* attach, if the volunteer fire department had been found to be a governmental agency. Again, nothing in the *Utica* analysis indicates that firefighting has traditionally been the *exclusive* province of the State of Maryland. Indeed, the existence of volunteer fire departments such as the defendant here, throughout the State, many of which received nothing at all of value from any government for decades or even centuries, would indicate that the *opposite* is true.

department for the area, as evidenced by city and state regulation of its operations, *ownership* of its buildings and equipment, and interference in its membership and officer approval process, the *Williams* court held that the Company belonged to the governmental branch of the municipality. *Id.* at 562. The Court further found that RFC's status as a city agency was not affected by the fact that it was largely comprised of non-salaried firemen. *Id.* As a consequence, the *Williams* court held that the RFC-operated pool/arena complex was a public accommodation; therefore, segregation was prohibited under the Fourteenth Amendment. *Id.* at 563.

In *Everett,* the plaintiff alleged that his application to become a member of the Volunteer Fire Department of the Village of Tarrytown, New York was rejected solely on the basis of his race. 261 F.Supp. at 466. The volunteer fire department at issue was organized under special provisions of New York's Corporations Law, which required the consent of a majority of the village trustees, who were elected officials of the municipality. Further, the *Everett* defendant's fire houses were built, owned, and operated by the Village of Tarrytown, as was all fire protection equipment. *Id.* at 467. Finally, the volunteer firefighters were eligible for substantial benefits, including a reduced assessment of $500 on their homes for the purpose of Village real estate taxes. *Id.*

Holding that the Village fire department was not a purely social or benevolent organization, the *Everett* court denied the defendant's motion for judgment on the pleadings and, because it considered material outside the pleadings, for summary judgment. *Id.* at 469. The *Everett* court specifically noted "the fact that [the] defendant is in large measure composed of non-salaried firemen [does not] affect its status as a publicly-owned or governmental facility." *Id.* at 467, *citing Williams,* 254 F.Supp. at 556.

Plaintiff Haavistola cites *Everett* for the proposition that "a voluntary fire department is performing a function normally governmental in nature." 261 F.Supp. at

467. Because a function is *normally* performed by the government does not mean that it is exclusively within the province of the government, as is required under *Jackson* and its progeny. Further, in citing *Williams* for the proposition that the Village fire company was a governmental facility, the *Everett* court did not appear to acknowledge the fact that, unlike in *Williams,* dispute did exist regarding whether the Village fire department was an agent of the city it served. 261 F.Supp. at 467.

To cite *Williams* and *Everett* as standing for the proposition, in this circuit, that fire protection is exclusively within the province of the state appears, at the very least, to be an unintended and unforeseen expansion of the law. This Court does not wish to add yet another case to the body of precedent which has at its root, when one tracks the opinions backward in time, a case that does not support the proposition for which it is cited. (Parenthetically, it constantly amazes one researching the law how frequently, when the "seminal" case is reached, there is "no there there.") This Court will not, therefore, equate the actions of the Fire Company in the present case with those before the court in *Williams* or *Everett.*

Further, the plaintiff cites this Court to *Kronmuller,* 123 F.R.D. 170. In *Kronmuller,* a member of a local fire company was dismissed after he failed to attend a meeting before the fire company's Board of Directors. *Id.* at 171. He appealed his dismissal to the local Borough Council, which, in addition to hearing all appeals regarding dismissals or suspensions of the firemen, approved and appointed all officers of the defendant fire department and was able to take disciplinary action against its individual members. *Id.* at 174. Based upon information regarding the close connection between the Borough Council and the fire company, the *Kronmuller* court found the plaintiff had raised genuine issues of material fact regarding whether the volunteer fire company performed an exclusively governmental function as per *Flagg Brothers* and *Rendell–Baker,* making dismissal under Rule 12(b) or 56 inap-

propriate. *Kronmuller,* 123 F.R.D. at 175.[21] Again, in the present case, the Fire Company has no "close connection" with the State or local governments as was present in the *Kronmuller* case.

Even the *Janusaitis* court, which stated that fire protection was sufficiently "associated with sovereignty" to justify treating the fire department defendant there as an instrumentality of the state, recognized that the function performed had to be one which was traditionally within the exclusive province of the government. 607 F.2d at 23–24.[22] The *Janusaitis* court noted specifically that the Connecticut statute authorizing agreements with volunteer fire departments implicitly acknowledged that firefighting was "essentially the exclusive function of government" which may be delegated to a group of volunteers by agreement. 607 F.2d at 24. Unlike Connecticut, this Court takes judicial notice of the fact that Maryland volunteer fire departments operate in a gray area. *See supra* note 20 for a discussion of Maryland law regarding the function of volunteer fire departments.

The importance of the distinctions in the cases analyzed above in a fact-bound inquiry such as this is manifest. As a private entity that provides firefighting services to the Rising Sun community, the defendant Fire Company does indeed perform a public function which is often within the province of the State. This Court recognizes, of course, that there are areas of the country in which the performance of fire protection activities is left exclusively to the state or local governments. The public function test, however, has been given a "narrow scope" in past decisions in this circuit. *See Eggleston,* 569 F.Supp. at 1351. This Court does not find that the precedent cited

by the plaintiff indicates that, in Maryland generally and Cecil County in particular, fire protection has traditionally been the exclusive prerogative of the State. Thus, defendant's firefighting activities do not serve to satisfy the "public function" test, and plaintiff's argument that the Fire Company operated as a "state actor" in so performing is without merit.

In further support of her contention that the defendants are liable under § 1983, the plaintiff maintains that the Fire Company is discharging powers that are governmental in nature. (Pl.'s Opp'n at 9.) Plaintiff argues that the Fire Company has the "capacity to command or prohibit actions by individuals against their will," and its authority is therefore governmental. *Utica Mutual Ins. Co.,* 53 Md.App. at 598, 455 A.2d at 992. In specific, plaintiff alleges that the Fire Company has the power to conduct fire inspections of buildings and structures, to enter buildings where a fire is in progress, to order any person to leave the building, to order caravans of vehicles, crafts, or railway cars to be detached, and to maintain order in the vicinity of a fire or other emergency. Md.Ann.Code, art. 48, § 181(a). (See Pl.'s Opp'n at 9.) Further, the Fire Company's officers can order the removal of combustible materials from buildings, and members may be appointed deputy sheriffs while at or on their way to and from fires. Md.Ann.Code art. 87, § 49, *et seq.* This argument has not been considered, by the plaintiff or in the case law, as a separate theory for finding state action; rather, the presence of powers "governmental in nature" has been considered as yet another of the possible indicia of state action and therefore may be best considered in tandem with the public function analysis. *See generally Jackson v. Metro-*

---

**21.** The *Kronmuller* court commented: "[w]e need not decide whether fire fighting *per se,* is an activity traditionally the exclusive prerogative of the state. We do conclude, however, that whether responsibility for fire protection in [the municipality in question] may be delegated to the [Fire Company] without that organization becoming a state actor at least involves questions of fact." *Kronmuller,* 123 F.R.D. at 175, *citing Adams* and *Janusaitis.*

**22.** Cases such as *Janusaitis,* wherein the Second Circuit rejected the district court's distinction of

*Williams* and *Everett* because the cases involved racial discrimination and, instead, found them to be "logically persuasive," have also found state involvement in ways not present here. 607 F.2d at 21, 24. In *Janusaitis,* the Town owned the land, buildings, and equipment used by the defendant fire department. Further, the Town Board of Selectmen had the final vote of approval on the election of a Chief of the fire department. 607 F.2d at 17.

*politan Edison Co.*, 419 U.S. at 345, 95 S.Ct. at 449.

The actions cited by the plaintiff as "governmental" appear to be included in this Court's general understanding of "firefighting" activities, and thus are encompassed in the above analysis. To the extent these actions are not associated exclusively with "firefighting," the plaintiff has offered no support for the proposition that these activities, unlike those examined extensively above, have traditionally been the *exclusive* province of the State of Maryland. As a consequence, this argument, even when examined as separate from a general analysis of the public function of "fire fighting activities," must also fail.

### 5. *Membership in the Fire Company— A Right or a Privilege*

■ Even if this Court were to find that the Fire Company was exercising a public function, or was acting as the state under any of the other theories discussed above, plaintiff Haavistola would still have to satisfy the second part of the § 1983 test. The Court in *Adams v. Bain*, acknowledged that, prior to § 1983 liability being imposed, "the [complained of] deprivation must be caused by the · exercise of some right or privilege created by the state...." 697 F.2d at 1217. The question here, therefore, is whether being placed on indefinite suspension from membership in a volunteer fire department is the sort of "right" or "privilege" for which § 1983 liability may be imposed. In *dicta*, the *Adams* court noted the following:

> One aspect of the alleged retribution was dismissal from membership in the volunteer fire department. We need not decide whether such membership is a right or a privilege because the revocation of such membership is the kind of injury that can support a § 1983 action.

697 F.2d at 1217 n. 5. *See also Kronmuller v. West End Fire Co.*, 123 F.R.D. at 175 (agreeing with *Adams'* analysis and concluding that extent of plaintiff's injury remained a question of fact to be resolved at trial.)

In support of this proposition, the *Adams* court cites two district court cases, *Williams* and *Everett*, and one Supreme Court case, *Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). Once again, this Court does not find that these cases support the proposition for which they are cited. As mentioned previously, *Everett* involved the exclusion of the plaintiff, allegedly on the basis of race, from membership in a volunteer fire department which was extensively controlled by, and whose land and assets were owned by, the Village which it served. 261 F.Supp. at 466–68. *Williams* was a class action suit brought by black citizens to enjoin the segregation of recreational facilities operated by a volunteer fire department which was undisputedly an agency of the city it served. 254 F.Supp. at 557–58. Neither *Williams* nor *Everett* concerned a revocation of membership; rather, these cases addressed the inability, allegedly based upon invidious race discrimination, of an applicant to become a member of or belong to facilities operated by a volunteer fire department. Further, *Terry v. Adams* concerned the denial of access to voting, due to segregation of a private association which controlled the voting process and excluded black citizens. 345 U.S. at 470, 73 S.Ct. at 813. None of these cases indicate that revocation of membership in a volunteer fire department automatically supports a § 1983 suit.

Additionally, even if this Court were uncritically to accept the *dicta* in *Adams*, the injury complained of here was not a dismissal in the formal sense of the word, but rather an indefinite suspension. This Court does not find that the difference in the alleged retribution, standing alone, would be sufficient to distinguish this case from that discussed in *Adams*. Placed in context with the discussion above, however, the difference between the undisputed facts here and those in *Adams* is sufficient for this Court to conclude that the Fire Company's actions implicated neither the sort of right nor privilege for which § 1983 liability may be imposed.

This Court is of the opinion that neither the Town of Rising Sun nor the State of

**1400**

Maryland is so involved in the provision of firefighting services in the community here to make the Fire Company liable under § 1983. Public policy demands that this Court recognize the realities of small community fire department operation. Such companies play a vital role in the communities which they serve and, when possible, their continued existence should be encouraged. The law should not treat such volunteer organizations as mini-municipalities—forced to make decisions as are required of such local governments, but without the benefit of legal counsel, training, or the public treasury to satisfy judgments. Rather, public policy should foster the volunteer spirit and promote greater levels of service to these fire companies. It would be imprudent for this Court to require this Fire Company—comprised of volunteers—to function as does the State. To the extent that the case law is read to support such a result, it is rejected by this Court. Placing such a burden upon voluntary community associations might well force them to abandon their core mission: to provide quality, cost-effective fire protection to the rural communities of Maryland. This Court cannot countenance such a result.

Based upon this Court's review of the undisputed facts as applied to the well-settled law of § 1983, defendants' motion for summary judgment as to Counts I, II, & III is hereby *granted.*

### V. *Pendent Jurisdiction*

This Court has jurisdiction over plaintiff's state law claims under the concept of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Council of Unit Owners of the Wisp Condominium, Inc. v. Recreational Industries, Inc.,* 793 F.Supp. 120 (D.Md.1992). Because, however, this Court has granted defendants' motion for summary judgment as to each of the plaintiff's federal claims, *Gibbs* dictates that the plaintiff's state claims should be dismissed. *See Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 ("if the federal claims are dismissed before trial ... the state claims should be dismissed as well.") While this Court recognizes that the *Gibbs* rule is not to be applied inflexibly in all cases, consideration of the balance of pendent jurisdiction factors—judicial economy, convenience, fairness, and comity—present here directs this Court to decline to exercise jurisdiction over the plaintiff's remaining state-law claims. *See Carnegie–Mellon University, et al. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988).

### VI. *Conclusion*

In summary, the Court finds that the Fire Company is entitled to summary judgment on the plaintiff's Title VII (Counts XII and XIII) and § 1983 (Counts I, II, and III) claims. Further, because the Court has *granted* summary judgment as to these Counts, it hereby *dismisses* state law counts IV, VII, VIII, IX, X, and XI.