6 F.3d 211
 63 Fair Empl.Prac.Cas. 207,
62 Empl. Prac. Dec. P 42,570, 62 USLW 2323
 Paula HAAVISTOLA, Plaintiff-Appellant,
v.
COMMUNITY FIRE COMPANY OF RISING SUN, INC.; Richard G.
Ayers; Kimberly Baeder; Raymond Blakely; Betty Cameron;
Wesley F. Cameron; Samuel H. Coale; William Ewing;
Charles R. Goodie; Howard Goodie; William Haines; Wayne
L. Ingerson; Jeffrey Kennerd; Harold Montgomery, Jr.;
Gary R. Moore; Kenneth E. Morris; Jimmy G. Puffenbarger;
Carl Rickenboch; Carol Tichnell; Donald K. Wehry; Carl D.
Wiggins; Tamra Wiggins; Herrel Curry, Defendants-Appellees,
and
Michael Smith; Philip Smith; Wade Wiley, individually and
in their capacity as Members of the Board of
Directors of Community Fire Company of
Rising Sun, Inc.; Kenneth E.
Truitt, Defendants.
Washington Lawyers' Committee for Civil Rights Under Law;
National Association for the Advancement of
Colored People, Incorporated; Women's
Law Center, Inc., Amici Curiae.
 No. 93-1286.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 13, 1993.
Decided Oct. 4, 1993.
 
 Awilda Rose Marques, Piper & Marbury, Baltimore, MD, argued (George A. Nilson, Piper & Marbury, Baltimore, MD, Susan K. Goering, Deborah A. Jeon, ACLU of Maryland, Centerville, MD, on brief), for plaintiff-appellant.
 Roger Norman Powell, John Paul Rufe, Baltimore, MD, for defendants-appellees.
 S. William Livingston, Jr., Alan A. Pemberton, Ronald J. Krotoszynski, Jr., S. Elizabeth Wilborn, Covington & Burling, Washington, DC, for amici curiae.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Paula Haavistola brought an action against Community Fire Company of Rising Sun, Inc. ("Fire Company"), alleging discrimination on the basis of sex in violation of 42 U.S.C. Sec. 1983 and Title VII of the Civil Rights Act, 42 U.S.C. Secs. 2000e to 2000e-17 ("Title VII"). The district court granted summary judgment for the Fire Company on grounds that the Fire Company was not a state actor for the purposes of section 1983 and that Haavistola was not an employee covered by Title VII. Haavistola appeals the grant of summary judgment on both claims. Finding summary judgment to be an inappropriate juncture at which to resolve these complex issues, we reverse.
 
 
 2
 * This suit stems from an occurrence on March 24, 1990, during which Haavistola claims she was sexually assaulted by Kenneth Truitt. At the time of the alleged assault, Haavistola and Truitt were volunteers at the Fire Company. The Fire Company is a privately-formed Maryland corporation that provides firefighting, emergency medical/paramedic, and rescue services to Rising Sun, Maryland and the surrounding area.
 
 
 3
 Haavistola promptly reported the alleged assault to Assistant Fire Chief Carl Rickenboch, who advised her to present her complaint to the Fire Company's Board of Directors at their next scheduled meeting. Haavistola appeared before the Board and detailed her allegations against Truitt. The Board asked Haavistola to confront Truitt with the charges, and after she agreed to do so, Truitt was brought into the meeting. Haavistola was asked to leave the meeting so the Board could question Truitt. The Board then asked Haavistola to return and make her charges against Truitt. Truitt summarily denied all of Haavistola's allegations. Following a brief deliberation outside the presence of Haavistola and Truitt, the Board voted to suspend both parties indefinitely from membership in the Fire Company.
 
 
 4
 Subsequent to her suspension, Haavistola filed a criminal complaint against Truitt in state court. Truitt ultimately was cleared of the charges and reinstated as a member in good standing with the Fire Company. The Fire Company refused to reinstate Haavistola. On April 25, 1990, Haavistola filed a charge of discrimination with the Equal Employment Opportunity Commission, which was deferred to the Maryland Commission on Human Relations. Then, on June 18, 1990, Haavistola brought this action against the Fire Company, alleging that its refusal to reinstate her represented discrimination on the basis of sex in violation of 42 U.S.C. Sec. 1983 and Title VII of the Civil Rights Act, 42 U.S.C. Secs. 2000e-2(a), -3(a).
 
 
 5
 The Fire Company filed a motion for summary judgment, asserting that it was not a state actor covered by 42 U.S.C. Sec. 1983 and that it did not share an employer/employee relationship with Haavistola and thereby was excluded from coverage under Title VII. The district court granted the motion on both grounds, and Haavistola appeals.
 
 II
 
 6
 We first summarize the legal standard by which we review the district court's grant of summary judgment. Our review is de novo and, therefore, we are constrained to review the record under the same standard by which the district court was bound. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127-28 (4th Cir.1987). Summary judgment is appropriate in those cases in which there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); McKinney v. Board of Trustees, 955 F.2d 924, 928 (4th Cir.1992). In other words, summary judgment should be granted in those cases in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law. McKinney, 955 F.2d at 928; Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979). In making our determination under this standard, we must draw all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986); McKinney, 955 F.2d at 928.
 
 III
 
 7
 Turning to the merits of this appeal, we must decide whether the record conclusively establishes on the basis of uncontroverted facts that (1) the Fire Company is not a state actor subject to suit under 42 U.S.C. Sec. 1983 and (2) Haavistola and the Fire Company did not share an employee/employer relationship governed by Title VII.
 
 
 8
 * 42 U.S.C. Sec. 1983 provides, in relevant part, that:
 
 
 9
 "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
 
 
 10
 To establish a claim under section 1983, a plaintiff must prove two elements:
 
 
 11
 First, the plaintiff must prove that the defendant has deprived him of a right secured by the "Constitution and laws" of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970) (quoting 42 U.S.C. Sec. 1983). In cases construing section 1983, "under color" of law has been treated consistently as equivalent to the "state action" requirement under the Fourteenth Amendment. Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982).
 
 
 12
 In this case the Fire Company asserted and the district court agreed that the Fire Company did not act with the requisite state action to establish the second element needed to make out a successful claim under section 1983. Haavistola v. Community Fire Co., 812 F.Supp. 1379, 1390-1400 (D.Md.1993). The issue for our review is whether the Fire Company, a private corporation organized under the laws of Maryland, funded to some extent through state and local resources, and regulated extensively by the State of Maryland, acted under color of state law when it permanently suspended Haavistola from its membership. "Concededly, the defendant [is a] private part[y] and, therefore, the 'question is whether [its] conduct has sufficiently received the imprimatur of the State so as to make it "state" action....' " Alcena v. Raine, 692 F.Supp. 261, 266 (S.D.N.Y.1988) (quoting Blum v. Yaretsky, 457 U.S. 991, 1003, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982)).
 
 
 13
 The Supreme Court has identified three situations in which particular conduct by a private entity constitutes "state action." The first situation is the symbiotic relationship and occurs when there is
 
 
 14
 a sufficiently close nexus between the state and the challenged action of the regulated entity such that those actions may be fairly treated as those of the state; the inquiry is whether the state is responsible for the specific conduct of which the plaintiff complains.
 
 
 15
 Alcena, 692 F.Supp. at 267 (citing Blum, 457 U.S. at 1004-05, 102 S.Ct. at 2785-86). The second situation involves extensive governmental regulation of a private entity: "a state may be held responsible for private conduct only when it has exercised coercive power or has provided such significant encouragement that the action must in law be deemed to be that of the state." Id. (citing Blum, 457 U.S. at 1004-05, 102 S.Ct. at 2786). The final situation occurs when "the private entity has exercised powers that are traditionally the exclusive prerogative of the state." Id. (citing Blum, 457 U.S. at 1004-05, 102 S.Ct. at 2786). Relevant to all three situations is the level of governmental funding the private entity receives, although "[r]eceipt of state funds [alone] is ... insufficient to transform ... private actions into state actions." Id.
 
 
 16
 Haavistola clearly failed to establish that the Fire Company acted under color of state law by means of a symbiotic relationship or excessive regulation. The Supreme Court has limited the symbiotic relationship analysis as follows:
 
 
 17
 We cautioned ... that while "a multitude of relationships might appear to some to fall within the [Fourteenth] Amendment's embrace," differences in circumstances beget differences in law, limiting the actual holding to lessees of public property.
 
 
 18
 Jackson v. Metropolitan Edison Co., 419 U.S. 345, 358, 95 S.Ct. 449, 457, 42 L.Ed.2d 477 (1974) (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 726, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)) (emphasis added). In the case at hand, the Fire Company owns all of its buildings, vehicles, and equipment; therefore, it is not engaged in any type of leasing arrangement with a governmental unit that would give rise to a symbiotic relationship.
 
 
 19
 The Supreme Court, when addressing the extent to which state regulation will convert private actions into state actions, has held on numerous occasions that the regulatory scheme must impact directly the alleged constitutional violation. See, e.g.,Blum, 457 U.S. at 1005, 102 S.Ct. at 2786 ("The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties. There is no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits in conformity with changes in the cost of medically necessary care."); Rendell-Baker, 457 U.S. at 841, 102 S.Ct. at 2771 ("Here the decisions to discharge the petitioners were not compelled or even influenced by any state regulation. Indeed, in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters."); see alsoBeverley v. Douglas, 591 F.Supp. 1321, 1329 (S.D.N.Y.1984) ("Nor is extensive state regulation sufficient to make an entity's personnel actions state action, as long as the personnel actions were not compelled or influenced by any state or federal regulation.").
 
 
 20
 In this case, the Maryland statutes governing volunteer fire departments contain no provisions regarding department membership. The Fire Company is free to select members by any means it chooses and similarly may terminate or suspend those members at its discretion. The State of Maryland, despite its extensive system of statutes governing fire protection in general and volunteer fire departments specifically, places no requirements on who actually fights the fires. See Md.Ann.Code art. 38A, Secs. 1-67 (1990 & Supp.1992). Without regulations addressing the qualifications for membership and the terms under which one serves as a member of a volunteer fire department, the State of Maryland cannot be said to exert the type of control over the Fire Company's personnel matters that gives rise to state action on the Fire Company's part in its dealings with its membership.
 
 
 21
 The third situation in which state action is imputed to a private actor arises when the private actor is engaged in a public function. The Supreme Court has described the public function analysis as follows:
 
 
 22
 [T]he relevant question is not simply whether a private group is serving a "public function." We have held that the question is whether the function performed has been "traditionally the exclusive prerogative of the State."
 
 
 23
 Rendell-Baker, 457 U.S. at 842, 102 S.Ct. at 2772 (quoting Jackson, 419 U.S. at 353, 95 S.Ct. at 455) (emphasis added by Rendell-Baker Court). In Blum v. Yaretsky, the Court suggested that the analysis should involve review of the alleged misconduct, and not just the overall function of the alleged state actor, noting:
 
 
 24
 We are ... unable to conclude that the nursing homes perform a function that has been "traditionally the exclusive prerogative of the State."... Even if respondents' characterization of the State's duties were correct, however, it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public.
 
 
 25
 Blum, 457 U.S. at 1011-12, 102 S.Ct. at 2789-90 (quoting Jackson, 419 U.S. at 353, 95 S.Ct. at 455).
 
 
 26
 The Supreme Court has not addressed directly whether firefighting is a public function,[1] but the Court has addressed another statutorily-mandated public service. In Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court addressed whether an electric company that provided an essential public service required to be supplied on a reasonably continuous basis by a Pennsylvania statute performed an exclusive public function. Id. at 352, 95 S.Ct. at 454. The Court held:If we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. But while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes no such obligation on the State. The Pennsylvania courts have rejected the contention that the furnishing of utility services is either a state function or a municipal duty.
 
 
 27
 Id. at 352-53, 95 S.Ct. at 454-55. Based on Pennsylvania's view of an electric company's function, the Court declined to accept the private provision of electricity as state action. Id. at 353, 95 S.Ct. at 454-55.
 
 
 28
 In this circuit, we have addressed firefighting as an exclusive public function on two instances. Neither case, however, is dispositive. In the first, Adams v. Bain, 697 F.2d 1213 (4th Cir.1982), we were asked
 
 
 29
 whether the alleged retribution against appellants because of their actions at a public meeting and the alleged procedural irregularities in removing them from the [Volunteer Fire Department] can be charged to the "state" or only to the [Volunteer Fire Department] acting purely as a private entity.
 
 
 30
 Id. at 1217. We ruled that dismissal of the action on a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure was inappropriate on the following basis:
 
 
 31
 "We need not decide whether the [Volunteer Fire Department] is a private organization and, if so, whether fire fighting per se is an activity 'traditionally the exclusive prerogative of the State.' Whether, however, responsibility for public fire protection may be delegated to the [Volunteer Fire Department] without that organization becoming a 'state actor' at least involves questions of fact. Any determination of whether fire fighting in York County[, Virginia] is traditionally an 'exclusive public function' requires the application of the broad but well defined legal principles ... to the particular facts of this case."
 
 
 32
 Id. at 1218-19 (quoting Jackson, 419 U.S. at 353, 95 S.Ct. at 455) (footnote omitted). A Rule 12(b)(6) dismissal was premature, we held, because the resolution of the "state actor" issue involved a fact-specific determination not possible based on review of the plaintiff's complaint alone. Id. at 1219; see also Fed.R.Civ.P. 12(b)(6).
 
 
 33
 We also affirmed a Maryland district court's decision more squarely addressing the issue presented in this case. SeeKrieger v. Bethesda-Chevy Chase Rescue Squad, 599 F.Supp. 770 (D.Md.1984), aff'd by unpublished opinion, 792 F.2d 139 (4th Cir.1986). In Krieger the plaintiff was seeking redress of a constitutional violation by the Bethesda-Chevy Chase Rescue Squad ("Rescue Squad"). The Rescue Squad was a non-profit Maryland corporation governed by a Board of Directors elected by its membership. Members were all volunteers and received no direct remuneration for their services. Id. at 771. The Rescue Squad provided rescue, ambulance, firefighting support, and emergency medical services in Montgomery County, Maryland. Id. at 772. The Rescue Squad owned its own building and surrounding real estate, as well as all of its vehicles. It received no direct financial assistance from the State of Maryland, but did receive free water and sewer from the county. The squad members were covered by Maryland's Workers' Compensation statutes, and members and their survivors were entitled to a lump-sum benefit if the member was injured or killed in the line of duty. Id.
 
 The district court opined:
 
 34
 "Plaintiff's other argument for finding a 'public function' lies in the fact that the defendant purportedly performs firefighting functions. Unquestionably, firefighting is traditionally an exclusively public function. What defendant actually does at fires, however, is assist the firefighters on the scene by providing emergency lighting and power if necessary.... This, however, does not make the Rescue Squad a volunteer or adjunct fire department.... Assisting the fire departments in an ancillary manner is not enough to convert the defendant's actions into the public function of firefighting.
 
 
 35
 ... In this case, where the defendant does not participate in the management or control of the firefighting, is neither equipped to nor participates in the essential tasks of firefighting, but rather provides, only if necessary, the rather passive services of emergency light and power, and is present at the scene for its own reasons unrelated to firefighting, the Court cannot hold defendant to be engaged in the public function of firefighting."
 
 
 36
 Id. at 773-74 (footnote omitted).
 
 
 37
 Review of the preceding precedents and decisions does little to simplify the issue of when a private entity assumes the role of state actor due to its involvement or provision of an exclusive public function. The cases inform the analysis in two ways: first, the determination is a factually intense analysis; and second, its outcome hinges on how a given state itself views the conduct of the function by the private entity.
 
 
 38
 In this case, the undisputed facts show the following. The Fire Company owns both the land and the two buildings which house its firefighting and rescue equipment. It also owns its firefighting and ambulance/rescue vehicles and equipment. The Fire Company enacts its own rules and regulations with respect to its operations and elects its own governing unit, a Board of Directors, without state intervention. Neither the Fire Company's elected officials nor its general membership is subject to approval of any governmental authority.
 
 
 39
 The Fire Company does receive state and county funding for fire protection services. Accepting Haavistola's evidence in a light most favorable to her, the district court found that twenty to forty percent of the Fire Company's annual operating budget derived from these sources. The district court went on to conclude that
 
 
 40
 [a]gain, nothing ... indicates that firefighting has traditionally been the exclusive province of the State of Maryland. Indeed, the existence of volunteer fire departments such as the defendant here, throughout the State, many of which received nothing at all of value from any government for decades or even centuries, would indicate that the opposite is true.
 
 
 41
 ....
 
 
 42
 ... [T]his Court takes judicial notice of the fact that Maryland volunteer fire departments operate in a gray area....
 
 
 43
 The importance of the distinctions in the cases analyzed above in a fact-bound inquiry such as this is manifest. As a private entity that provides firefighting services to the Rising Sun community, the defendant Fire Company does indeed perform a public function which is often within the province of the State.... This Court does not find that the precedent cited by the plaintiff indicates that, in Maryland generally and Cecil County in particular, fire protection has traditionally been the exclusive prerogative of the State.
 
 
 44
 Haavistola, 812 F.Supp. at 1396 n. 20, 1398.
 
 
 45
 The district court's analysis is flawed in that it draws factual conclusions inappropriate on a motion for summary judgment and that it makes a determination about the status of fire protection as a public function in Maryland without any direct evidence as to how fire protection is conducted throughout the State. The court's judicial notice of the facts that many volunteer fire departments operate in Maryland without governmental intervention at all and that all volunteer fire departments operate in a gray area as to the functions they provide reaches disputed adjudicative facts and is unsupported by any record evidence. The district court abused its discretion under Rule 201(c) of the Federal Rules of Evidence by taking judicial notice of these facts. The court further used notice of these facts to reach its conclusion that the Fire Company is not engaged in an exclusive public function. Without establishing these facts as undisputed in the record, the district court erred by granting summary judgment as there remains a genuine issue of material fact. See Fed.R.Civ.P. 56(c).
 
 
 46
 Haavistola and the Fire Company should be allowed to introduce evidence as to the function of fire protection in Maryland rather than be bound by the district court's own unexplained conclusions. The fact that another district court in Maryland reached a different conclusion than the Haavistola court suggests that minds could reasonably differ over the function of firefighting organizations in the State. See Krieger, 599 F.Supp. at 773 ("Unquestionably, firefighting is traditionally an exclusively public function."). A dispute such as this cannot be resolved based on unsubstantiated judicial notice on summary judgment.
 
 
 47
 As an additional reason for denying Haavistola relief under section 1983, the district court held that "the Fire Company's actions implicated neither the sort of right nor privilege for which Sec. 1983 liability may be imposed." Haavistola, 812 F.Supp. at 1399. The type of right/privilege dichotomy the district court used to frame its analysis is normally found in allegations of violations of the Fourteenth Amendment's due process guarantees. The Supreme Court has held that employees must have a cognizable property or liberty interest in continued employment in order to trigger due process protection. Board of Regents v. Roth, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).
 
 
 48
 Haavistola alleges an equal protection violation, as well as due process violations. Haavistola claims that the Fire Company's refusal to end her suspension and reinstate her as a member after doing so for Truitt represents discrimination based upon her sex. This allegation represents a colorable Fourteenth Amendment equal protection violation; therefore, the district court erred in concluding on a motion for summary judgment that Haavistola had failed to establish the violation of a constitutional right needed to proceed with a claim under section 1983.
 
 B
 
 49
 Title VII of the Civil Rights Act outlines the following unlawful conduct:
 
 
 50
 (a) It shall be an unlawful employment practice for an employer--
 
 
 51
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 
 
 52
 42 U.S.C. Sec. 2000e-2(a).
 
 
 53
 It shall be an unlawful employment practice for an employer to discriminate against any of his employee[ ] ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 
 
 54
 Id. Sec. 2000e-3(a).
 
 Title VII defines "employer" as
 
 55
 a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.
 
 
 56
 Id. Sec. 2000e(b). The term "employee" is defined as "an individual employed by an employer." Id. Sec. 2000e(f).
 
 
 57
 This case presents us with the issue whether Haavistola, a volunteer member of the Fire Company who receives no direct remuneration, is an employee covered under Title VII. Two lines of cases have developed on the construction of "employee" under Title VII. The first group deals with the situation in which compensation is uncontested, but the parties disagree as to whether the degree of control exerted over the putative employee evidences an independent contracting relationship. The second group involves those cases in which there is no evidence of compensation and, in all cases, the courts have found Title VII inapplicable.
 
 
 58
 Our decision in Garrett v. Phillips Mills, Inc., 721 F.2d 979 (4th Cir.1983), guides the analysis when compensation is evident and independent contractor status is at issue. In Garrett, we faced the determination whether a person was an employee[2] or an independent contractor for the defendant company. Id. at 980. We identified the crucial inquiry as follows:
 
 
 59
 [W]hether an individual is an employee ... is properly determined by analyzing the facts of each employment relationship under a standard that incorporates both the common law test derived from principles of agency and the so-called "economic realities" test first announced in Bartels v. Birmingham, 332 U.S. 126 [67 S.Ct. 1547, 91 L.Ed. 1947] (1947).
 
 
 60
 Id. at 981. The common-law standard traditionally used when deciding whether an individual can claim employee status emphasizes the importance of the employer's control over the individual. Id. In addition, "in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service." Bartels, 332 U.S. at 130, 67 S.Ct. at 1550 (discussing whether person was employee or independent contractor for the purposes of payment of social security taxes).
 
 
 61
 In Garrett and the cases it cites, the parties admittedly had a compensation agreement and were disputing only whether the compensation was for work as an employee or an independent contractor. Therefore, our analysis focused on the level of control the putative employer exercised over the putative employee. Garrett, 721 F.2d at 982. Control loses some of its significance in the determination whether an individual is an employee in those situations in which compensation is not evident.
 
 
 62
 Several cases from our sister circuits have addressed the scope of the term "employee" as it applies in this volunteer context. In Graves v. Women's Professional Rodeo Ass'n, 907 F.2d 71 (8th Cir.1990), the Eighth Circuit court of appeals dealt with the issue whether the membership roster of the Women's Professional Rodeo Association ("WPRA") could be construed as a list of its employees. Id. at 72. The WPRA was a non-profit corporation organized for the principal purpose of sanctioning rodeo barrel races. Although WPRA did not pay its members directly or indirectly, certain benefits inured from membership in the WPRA, including advances on rodeo entry fees and a chance for recognition as the World Champion Barrel Racer for a given year. Id.
 
 
 63
 The Graves court noted that the legislative history of the Civil Rights Act explicitly provides that the dictionary definitions should govern the interpretation of "employer" and "employee," filing in the gaps in otherwise broad, general definitions. Id. at 73 (citing 110 Cong.Reg. 7216 (1964)). The court found the dictionary definition of "employee" to be " 'one employed by another usu. in a position below the executive level and usu. for wages.' " Id. (quoting Webster's Third New Int'l Dictionary 743 (1981)). From this definition, the court concluded that
 
 
 64
 [c]entral to the meaning of these words is the idea of compensation in exchange for services: an employer is someone who pays, directly or indirectly, wages or a salary or other compensation to the person who provides services--that person being the employee. Compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, but it is an essential condition to the existence of an employer-employee relationship.
 
 
 65
 Id.
 
 
 66
 The court went on to discuss the appellant's assertion that the WPRA's control over its membership approximates an employer/employee relationship. The court noted first that control alone is not enough to establish an employment relationship, citing as an example the university/student relationship. Id. at 74. The court also recognized that "[c]ourts have turned to analyses such as the 'economic realities' test and 'right to control' test under Title VII only in situations that plausibly approximate an employment relationship." Id. Rejecting resort to a control analysis, the court held that the members of WPRA were not employees and, therefore, that the WPRA was not an employer subject to liability under Title VII. Id.
 
 
 67
 In Smith v. Berks Community Television, 657 F.Supp. 794 (E.D.Pa.1987), the district court addressed whether Berks Community Television ("BCTV"), which, at all relevant times, had nine paid employees and approximately eleven unpaid volunteers, was an employer under Title VII. Id. at 794. The BCTV volunteers received no financial remuneration of any kind, either direct or indirect, received no fringe benefits or reimbursement for expenses, and contributed assistance on a purely voluntary basis. Id. at 794-95. The court looked to Congress's purpose in enacting Title VII to determine its applicability to the BCTV volunteers and concluded that
 
 
 68
 "[i]n enacting Title VII, Congress sought to eliminate a pervasive, objectionable history of denying or limiting one's livelihood simply because of one's race, color, sex, religion or national origin."
 
 
 69
 ....
 
 
 70
 Unpaid volunteers are not susceptible to the discriminatory practices which the Act was designed to eliminate.
 
 
 71
 Id. at 795 (quoting McBroom v. Western Elec. Co., 429 F.Supp. 909, 911 (M.D.N.C.1977)).
 
 
 72
 Addressing the plaintiff's contention that control over a person--not remuneration--is the essential element of the definition of "employee," the court stated that cases applying the control analysis
 
 
 73
 are directed towards the distinction between an employee and an independent contractor, or a "borrowed servant." In such a case, the power to control and supervise the employee is the critical factor. Such a case is not dispositive of the instant issue.
 
 
 74
 Id. With that, the district court held that the volunteers at BCTV were not employees within the meaning of Title VII. Id. at 796.
 
 
 75
 Haavistola's situation falls somewhere between these two lines of cases. On the one hand, Haavistola did not receive direct compensation as a member of the Fire Company, but, on the other hand, she did not affiliate with the company without reward entirely. Haavistola received the following benefits as a result of her membership with the Fire Company: state-funded disability pension, Md.Ann.Code art. 25, Sec. 32.5 (1990); survivors' benefits for dependents, id. art. 38A, Sec. 42A; scholarships for dependents upon disability or death, id. art. 38A, Sec. 42B; art. 41, Sec. 4-1002 (Supp.1992); bestowal of a state flag to family upon death in the line of duty, id. art. 38A, Sec. 44 (1990); benefits under the Federal Public Safety Officers' Benefits Act when on duty, id. art. 38A, Sec. 45; group life insurance, id. art. 48A, Sec. 425 (1991); tuition reimbursement for courses in emergency medical and fire service techniques, Md.Educ.Code Ann. Sec. 18-605 (1992); coverage under Maryland's Workers Compensation Act, Md.L. & E.Code Ann. Sec. 9-234 (1991 & Supp.1992); tax-exemptions for unreimbursed travel expenses, Md.Tax-Gen.Code Ann. Sec. 10-207 (1988); ability to purchase, without paying extra fees, a special commemorative registration plate for private vehicles, Md.Transp.Code Ann. Sec. 13-618 (1992); and access to a method by which she may obtain certification as a paramedic.[3] See generallyHaavistola, 812 F.Supp. at 1386-88 (detailing benefits available to Fire Company members).
 
 
 76
 After reviewing the above listing of benefits, the district court denominated Haavistola's relationship with the Fire Company as one strictly of a volunteer, concluding that "[o]ne who volunteers, and therefore donates her time, is widely understood to be the opposite of one who is employed, and is compensated for her time." Id. at 1389.
 
 
 77
 The district court's decision that benefits received by Fire Company members are not sufficient to make them employees under Title VII involves the resolution of a disputed material fact. Because compensation is not defined by statute or case law, we hold that it cannot be found as a matter of law. The district court must leave to a factfinder the ultimate conclusion whether the benefits represent indirect but significant remuneration as Haavistola contends or inconsequential incidents of an otherwise gratuitous relationship as the Fire Company argues. This conclusion will indicate whether Garrett or the volunteer cases apply.
 
 
 78
 In addition to making an impermissible finding of fact, the district court drew an erroneous conclusion of law from our holding in Garrett. The district court suggested that, even if Haavistola could show that she was compensated as a member of the Fire Company, she failed to establish sufficient control by the Fire Company over its members to make them its employees. Id. at 1386. In support of this conclusion, the district court pointed to the voluntary nature of the members' association with the Fire Company. Id.
 
 
 79
 Nothing in our Garrett decision indicates that control over a putative employee hinges on that person's inability to extricate himself or herself from the relationship. Certainly, many employment relationships involve an employee engaged on an "at will" basis. The district court overlooked an extensive list of factors we outlined in Garrett to guide the "control" analysis,[4] and instead erroneously concluded that, because Haavistola was not conscripted into service with the Fire Company, she could not be its employee.
 
 IV
 
 80
 Returning to the standard by which our review throughout has been guided, we reiterate that the district court chose an inopportune time to dispose of very complex issues. Although summary judgment can suffice even in complicated cases, such is not the situation before us. Both the section 1983 and the Title VII claims involved fact-intensive determinations for which the district court was not equipped to rule on the basis of a summary judgment record alone. Therefore, we reverse the grant of summary judgment on both bases and remand for further proceedings not inconsistent with this opinion.
 
 
 81
 REVERSED AND REMANDED.
 
 
 
 [1]
 The Supreme Court recognized that it
 would be remiss if [it] did not note that there are a number of state and municipal functions ... which have been administered with a great[ ] degree of exclusivity by States and municipalities.... Among these are such functions as education, fire and police protection, and tax collection. We express no view as to the extent, if any, to which a city or State might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 163-64, 98 S.Ct. 1729, 1737-38, 56 L.Ed.2d 185 (1978) (footnote omitted). Despite this recognition of the important role States and municipalities play in education and other functions, the Court ruled, in Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), that a private school, whose income was derived primarily from public sources and which was regulated by public authorities, was not acting under the color of state law when it discharged certain employees for their outspoken views. Id. at 842, 102 S.Ct. at 2772. At best, the language in Flagg Bros. shows the Supreme Court's acknowledgment that fire protection may be an exclusive state function, but not that it must be an exclusive state function.
 
 
 [2]
 Although we were construing the definitions of "employee" and "employer" under the Age Discrimination in Employment Act ("ADEA"), the operative language in ADEA is identical to the operative language in Title VII, so the analysis utilized under either act is interchangeable. Garrett, 721 F.2d at 981 & n. 4; compare 42 U.S.C. Sec. 2000e(b), (f) (Title VII) with 29 U.S.C. Sec. 630(b), (f) (ADEA)
 
 
 [3]
 Pursuant to Maryland Department of Health and Mental Hygiene Program Standards Manual Section 1.1.2, an individual may acquire initial Emergency Medical Technician-Paramedic certification in one of two ways: (1) by obtaining one full year of continuous experience in providing pre-hospital emergency care immediately prior to application for certification or (2) by completing at least 150 emergency ambulance runs providing pre-hospital emergency care during the year immediately prior to application for certification. SeeHaavistola, 812 F.Supp. at 1388 n. 11. Although not the only method of establishing eligibility for paramedic certification, affiliation with a volunteer fire department offers the most practical approach. Otherwise, a certificate candidate with few highly marketable skills would have to find directly compensated employment with a rescue service. Volunteer fire departments provide the logical arena for the type of pre-certification apprenticing required by Section 1.1.2
 
 
 [4]
 In Garrett, we noted that crucial to the finding of control sufficient to make one an employee is consideration of the following factors:
 (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties. Garrett, 721 F.2d at 982.