Michelle P. NEFF, Plaintiff,

v.

CIVIL AIR PATROL, Defendant.

No. C–2–92–0472.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 25, 1996.

Robert Paul DiRosario, Columbus, OH, for plaintiff.

John G Salmon, Brown, Bartuwek & Worthing, Cleveland, OH, Robert M Karton, Chicago, IL, Gregory L Williamson, Brown Vartuner & Worthing, Cleveland, OH, for defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the Court's motion under Fed.R.Civ.P. 54(b) to reconsider its prior ruling that Plaintiff Michelle Neff ("Neff") met her summary judgment burden to show that she was an employee of the Civil Air Patrol ("CAP") entitled to the protection of Title VII.[1] The Court informed the parties of its intention to revisit this question in its Order of October 30, 1995, and requested that the parties submit evidence on this issue. Based upon this evidence, the Court **VACATES** the resolution it reached in its Opinion and Order dated October 26, 1995 concerning the employee status of Neff and now finds that she is not an employee within the jurisdiction or protection of Title VII.

### I.

The Civil Rights Act of 1964 and its subsequent amendments were enacted to remedy discrimination in various sectors of American life. Title VII is the specific portion of that Act designed to "rid the *world of work* of the evil of discrimination because of an individual's race, color, religion, sex, or national origin." *Armbruster v. Quinn*, 711 F.2d 1332, 1340 (6th Cir.1983) (emphasis added). The limited goal of Title VII is apparent in its jurisdictional requirement: a plaintiff under Title VII must be an "employee."

---

1. The relevant facts and standard of review in this matter are presented in this Court's earlier opinions dated October 18, 1993 and October 26, 1995.

42 U.S.C. § 2000e(f); *see also* 42 U.S.C. § 2000e(b)(2) (private membership club exclusion); Leda E. Dunn, Note, *Protection of Volunteers under the Federal Employment Law: Discouraging Voluntarism?*, 61 Fordham L.Rev. 451, 459 and n. 73 (1992).

In order to determine whether a person is an "employee" and therefore a proper plaintiff under Title VII, the Sixth Circuit considers whether the "economic realities" of a situation make the putative employee "susceptible to the kind of unlawful practices that Title VII was intended to remedy." *Armbruster*, 711 F.2d at 1342. Thus, "employee" status depends in large part upon the degree to which an individual is economically dependent upon the institution charged with discrimination. *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir.1992). Evidence of economic dependence can arise from the hiring and termination processes of the putative employer, the method of compensation, and the opportunities for advancement in the organization or elsewhere as a result of affiliation with the organization. *Armbruster*, 711 F.2d at 1342 n. 9.

## A.

The present case falls into the discrete line where a putative employee does not receive a paycheck or other direct compensation from the purported employer. Ordinarily, unpaid volunteers, whose livelihood does not depend upon their volunteer position, are not susceptible to the same types of economic pressures as are paid employees. *See Smith v. Berks Community Television*, 657 F.Supp. 794, 795 (E.D.Pa.1987). It is not surprising, therefore, that this Court's research has turned up only one case—*Haavistola v. Community Fire Co. of Rising Sun*, 6 F.3d 211 (4th Cir.1993)—where a federal court has found that a person who did not receive a paycheck could be a Title VII "employee." In *Haavistola*, the Fourth Circuit, using a test that combined "economic realities" with modified agency principles, held that Paula Haavistola, a volunteer firefighter, presented enough evidence to survive summary judgment on the issue of employee status. Haavistola was not paid by her local volunteer firefighting company, but by statute she received survivors'

benefits for her dependents, group life insurance, tuition reimbursement, coverage under Maryland's Workers' Compensation Act, access to the only practical route to paramedic certification, and other benefits. *Haavistola*, 6 F.3d at 221. These benefits, combined with evidence indicating that the Rising Sun fire company controlled Haavistola's duties and therefore her chances of advancement, were enough for the Fourth Circuit to find that Haavistola created an issue of material fact. The jury empaneled on remand, however, needed less than two hours to conclude that Haavistola was not an "employee" within the definition of Title VII (and that fire companies were not state actors under § 1983). *Haavistola*, 839 F.Supp. 372 (D.Md.1994).

With the exception of the appellate *Haavistola* opinion, every case discovered by this Court concludes that unpaid volunteers are not employees within the protection of Title VII. Some guiding principles emerge from these existing decisions. First, the prestige or good will created by a voluntary position does not transform that position into a position of employment. *Tadros v. Coleman*, 717 F.Supp. 996, 1005 (S.D.N.Y.1989) (prestige of voluntary hospital staff appointment not compensation), *aff'd* 898 F.2d 10 (2d Cir.); *Schoenbaum v. Orange County Center for the Performing Arts*, 677 F.Supp. 1036 (C.D.Cal.1987) (under ADEA). Second, minor benefits associated with a volunteer position do not constitute compensation, particularly when those benefits are not related to career opportunities. *Hall v. Delaware Council on Crime and Justice*, 780 F.Supp. 241, 244 (D.Del.1992) (free lunch, reimbursement for expenses, and other minor compensation), *aff'd* 975 F.2d 1549 (3d Cir.1992) (table). Third, even benefits that create career opportunities are not always compensation. *Graves v. Women's Professional Rodeo Ass'n*, 907 F.2d 71, 72 (8th Cir.1990) (championship titles and other nonremunerative awards do not create employee status without a duty to the purported employer); *Tadros*, 717 F.Supp. at 1005–06 (hospital office and library privileges, though prestigious, not employment without official duties and payment); *Beverley v. Douglas*, 591 F.Supp.

1321 (S.D.N.Y.1984) (same). Fourth, professional associations of similarly minded people are not employers, even if certain benefits are involved, as long as outsiders can earn the same benefits without membership. *See Graves,* 907 F.2d 71, 73 (8th Cir.1990) (membership in WPRA not employment relationship because non-members could compete for the same prizes). Stated more broadly, Title VII will not protect volunteers who are not working "in expectation of compensation." *Tony & Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 302, 105 S.Ct. 1953, 1962, 85 L.Ed.2d 278 (1985) (discussing analogous provision of the Fair Labor Standards Act). Upon review of these principles, this Court concludes that, even with all reasonable inferences drawn in her favor, Neff has not produced evidence that could lead a reasonable juror to conclude that she worked in expectation of compensation. She cannot be considered an employee.

### B.

■ Neff alleges that she received three basic forms of compensation from CAP, the combination of which made her an "employee."[2] First, she says that she received emotional benefit both from knowing that she was helping others and from her increased self-confidence. Neff describes these benefits as "ability to . . . meet new people," "self-improvement," "challenge of assisting people in need," "improvement in all aspects of a member's . . . life," "self-esteem," and "satisfaction of assisting in the saving of lives." (Doc. # 74.) Even if these benefits are all present, however, they do not forward Neff's case under the economic realities test; indeed, to the extent that they are relevant to the present litigation at all, they indicate that Neff joined CAP for voluntary and charitable

reasons unrelated to any potential financial benefits. The fact that Neff maintained a career (or several careers) apart from CAP further supports this conclusion. (Neff Trans. at 7–12.)

■ Second, Neff alleges that she received various in-kind services that helped her fulfill her role in CAP. Among these benefits, Neff first asserts that she received an annual "Form 5" ride. (Neff Trans. at 149.) "Form 5" rides, which last about an hour and a half, are used by CAP to ensure that its volunteers are competent to conduct the aerial maneuvers necessary for CAP's search-and-rescue missions and are a necessary prerequisite for volunteer pilots. (Doc. # 76, Exh. M, N; Civil Air Patrol Manual § 60–1, ¶¶ 3–3, 3–7; § 50–15, ¶ 2–9.) The rides are not always free to the volunteer; Neff admits that she paid for one, including the fee for the "check airman." (Neff Trans. at 150–51.) Neff similarly asserts that she received discounted flying time, but concedes that any "discounted" flight time she received was for CAP-approved "proficiency training" to help its pilots maintain their flying abilities. (Neff.Trans. at 145–49; *see also* Civil Air Patrol Manual § 60–1, ¶ 3–4 and Attach. 12–2.) Moreover, the "discounts" were not discounts at all, but instead constituted a fee designed to cover the maintenance costs of the plane excluding fuel, which was the sole responsibility of the pilot. (Neff Trans. at 34–35, 38, 58–59, 146; *see also* Doc. # 76, Exh. U.)[3] Neff also submits proof of various educational opportunities she received through CAP, including CAP's corporate leadership course, CAP's chaplain course, and a scanner/observer training session. (Neff Trans. at 152, 54, 57; Doc. # 76, Exh. D, K.)[4] Neff further estimates the cost of

---

**2.** Although Neff presents over twenty different benefits accruing with CAP membership, she provided the Court with evidence on only nine: (1) the death benefit for CAP members; (2) free jet simulator time; (3) free military "hops"; (4) income tax deductions related to CAP; (5) discounted airplane use; (6) free air time; (7) the CAP "Corporate Learning Course"; (8) "Scanner/Observer Training"; and (9) "Flight Training." Most of this evidence consists of Neff's sworn testimony at her deposition.

**3.** The only document submitted by Neff relating to her proficiency flying contains handwriting, apparently Neff's, stating "aircraft provided by myself." (Doc. # 76, Exh. I.) The Court cannot verify the handwriting, however, because this exhibit, like all others submitted by Neff, was not identified in a sworn statement.

**4.** CAP created a series of classes and other coursework to "train senior members in the special skills required for [CAP] mission accomplishment." *See* Civil Air Patrol Manual § 50–17, particularly at ¶¶ 3–2, 3–3, 4–1 (technical

these courses if taken through private institutions. (Neff Trans. at 154–59.) Neff does not relate a reason why she took these courses.

■ Taking all of Neff's assertions about in-kind services as true, Neff has not fulfilled her burden on summary judgment; in particular, Neff failed to adduce proof as to how the economic realities of these services made her dependent upon her position with CAP or made her an employee. Neff does not assert, for example, that the Form 5 training flights, the proficiency air time, or the training courses were necessary for her livelihood, would help her sustain her membership in CAP, or would help her find employment outside of CAP. She does not suggest that CAP's training classes were useful in obtaining certification of any kind. *Cf. Haavistola,* 6 F.3d at 211–12 (volunteer firefighting only practical route to paramedic certification). In short, Neff asserts that her flight time and education were compensation simply because they had value to her.[5] The economic realities test, however, requires more than value to the plaintiff; it requires a demonstration that the plaintiff has some economic dependence upon, and not mere pleasure from, the compensation.

The third type of compensation that Neff alleges she received comprises in-kind benefits not specifically related to the proficiency level of the CAP volunteers. The primary benefit Neff received was that, as a member of CAP, her survivors were entitled to FECA death benefits in the event that Neff died while on a CAP mission. *See Williamson v. Sartain,* 555 F.Supp. 487 (1982); *see also Haavistola,* 6 F.3d at 211 (death benefits may constitute compensation).[6] Neff also contends that members of CAP could take "hops"—extra seats on military planes scheduled to fly anyway—free of charge. (Neff Trans. at 160–62.) Neff took one hop while a member of CAP because she wanted to go to Hawaii. (*Id.*) Although she ended up in Anchorage, "that was all right." (Neff Trans. at 161.) Neff also asserts that CAP members were entitled to free time in Air Force flight simulators. (Neff Trans. at 160–61.) However, she fails to provide the amount of time that she could use the simulator or the benefit that she received from any such use. Another purported benefit, a CAP-related tax deduction, is frivolous. Because CAP members could deduct out-of-pocket moneys spent on CAP functions from their federal income tax, Neff asserts that CAP paid for her uniforms, gas mileage, and other costs. (Neff Trans. at 135–40.) Any deduction, however, is inapplicable unless the CAP volunteer has income large enough to need deductions and enough CAP expenditures to exceed the standard deduction. As a final benefit, Neff argues that CAP volunteers were compensated by CAP for flight time. (Neff Trans. at Exh. 7.) Neff's only sworn statements on the subject, however, directly contradict her attorney's letter submitted as an exhibit and, moreover, CAP has submitted uncontroverted evidence that any compensation was intended as reimbursement for wear and tear on airplanes, and not as payment. (Neff Trans. at 165–167; Doc. # 79, Exh. H (reimbursement schedule for 1993–94).)[7]

## C.

■ After examining the record and separating the wheat from the chaff, the Court finds no evidence of an employment relationship between CAP and Michelle Neff. The Sixth Circuit's "economic realities" test requires a plaintiff to demonstrate that her

---

course), 5–2 (corporate learning course), 6–5 (chaplain course). Each level of training is designed to help the CAP officer become better prepared for her next level of responsibility in CAP.

5. Neff propounds a similar line of reasoning when she asserts that CAP's organizational meetings were "compensation" equivalent to $30 a month because they help you "keep your mind on what you're doing." (Neff Trans. at 165.)

6. CAP submitted uncontroverted evidence that there were 10 FECA claims filed by CAP members between 1992 and 1994, none of which was from the Ohio Wing. (Handley Aff. at ¶ 7.) Moreover, Neff herself asserts that she flew very few actual missions. (Neff Trans. at 48–49.)

7. CAP has also submitted uncontroverted evidence that the average CAP volunteer spends an average of $2,000 or more a year in order to participate in CAP functions. (Handley Aff. at ¶ 5.)

position with the putative employer was one that either looked like an employment relationship—with traditional hiring schedules, compensation, and other benefits—or was likely to affect an employment relationship. *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 875 (6th Cir.1991). A plaintiff may be considered an "employee" whenever significant economic interests are at stake in her relationship with her putative employer.

█ Here, however, Neff has not produced any indicia of economic dependence or future employment opportunities. She did not receive direct income from CAP, did not use CAP as a stepping stone to another position, and did not need to participate in CAP as a coincident with another occupation. Neff produced evidence of several minor benefits from CAP, most notably military hops and FECA benefits, but on the whole Neff's membership in CAP was little different than another person's participation in other charitable organizations; Habitat for Humanity and the American Red Cross, for example, require some of their volunteers to have certain skills, check the level of skill that those volunteers have, and offer training to update those skills. Moreover, by Neff's own admission, she put more money into CAP than she received from it. Under the language of Title VII and the interpretations before this Court, this case has but one resolution: Michelle Neff has not created a genuine issue of material fact as to whether she was an employee within the protection of the statute. Accordingly, CAP's motion for summary judgment on the issue of "employee" status has merit and it is **GRANTED.** Neff's Title VII claims are **DISMISSED.**

## II.

Because the Court's resolution of this matter terminates all pending federal claims, and because the state system is in a better position to resolve any state issues, the Court **DISMISSES** Neff's remaining state claims **WITHOUT PREJUDICE.** This case is terminated.

**IT IS SO ORDERED.**